2014-1712

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

SFA SYSTEMS, LLC,

Plaintiff-Appellee

v.

NEWEGG INC.,

Defendant-Appellant

Appeal from the United States District Court for the Eastern District of Texas
in Consolidated Case Nos. 6:09-cv-340 and 6:11-cv-399,
Chief Judge Leonard Davis

## NON-CONFIDENTIAL BRIEF OF APPELLANT NEWEGG INC.

Kent. E. Baldauf, Jr.
Daniel H. Brean
THE WEBB LAW FIRM
One Gateway Center
420 Fort Duquesne Blvd., Suite 1200
Pittsburgh, PA 15222
Telephone: (412) 471-8815

Edward R. Reines
WEIL GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000

Richard G. Frenkel
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Telephone (650) 463-3080

*Counsel for Newegg Inc.*

October 28, 2014

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

SFA Systems v. Newegg, 2014-1712

<u>**CERTIFICATE OF INTEREST FOR NEWEGG INC.**</u>

Counsel for Newegg Inc. hereby certifies the following:

1.    The full name of every party or amicus represented by me is:

> Newegg Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

> Not applicable.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

> No publicly held company owns ten percent or more stock in Newegg Inc.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

> Kent E. Baldauf, Jr., The Webb Law Firm
> James J. Bosco, Jr., The Webb Law Firm
> Daniel H. Brean, The Webb Law Firm
> Anthony W. Brooks, The Webb Law Firm
> Bryan P. Clark, The Webb Law Firm
> Herbert A Yarbrough, III, Yarbrough & Wilcox, PLLC
> Debra Elaine Gunter, Yarbrough Wilcox, PLLC
> John N. Zarian, Parsons Behle & Latimer
> Lane M. Chitwood, Parsons Behle & Latimer
> Dana M. Herberholz, Parsons Behle & Latimer
> Sidney Calvin Capshaw, III, Capshaw DeRieux, LLP
> Elizabeth L. DeRieux, Capshaw DeRieux, LLP
> Damon Jeffrey Rambin, Capshaw DeRieux, LLP

i

Edward R. Reines, Weil Gotshal & Manges
Richard G. Frenkel, Latham & Watkins

Dated:  October 28, 2014

/s/ Kent E. Baldauf, Jr.
Kent E. Baldauf, Jr.
*Counsel for Newegg Inc.*

# **TABLE OF CONTENTS**

**CERTIFICATE OF INTEREST FOR NEWEGG INC.** ...................................... i

**TABLE OF CONTENTS** ................................................................. iii

**TABLE OF AUTHORITIES** ...........................................................v

**STATEMENT OF RELATED CASES** ............................................... ix

**JURISDICTIONAL STATEMENT** ....................................................1

**STATEMENT OF THE ISSUES** .......................................................1

**STATEMENT OF THE CASE** ..........................................................2

   I.   PROCEDURAL HISTORY .......................................................2

   II.  FACTUAL BACKGROUND .....................................................6

     A.   Preliminary Statement ...............................................6

     B.   The Parties and the Patent Litigation ........................8

     C.   The SFA Patents ....................................................10

     D.   The District Court's Claim Constructions ...............14

       1.   The '525 Patent Markman Proceedings...............15

       2.   The '341 Patent Markman Proceedings...............16

     E.   The Indefiniteness Summary Judgment Decision....................19

     F.   Newegg's Fee Motion .............................................21

**SUMMARY OF THE ARGUMENT** ................................................25

**STANDARD OF REVIEW** ............................................................27

**ARGUMENT** ................................................................................28

I.  THIS CASE IS EXCEPTIONAL AND EGREGIOUS, AND SFA SHOULD PAY
    NEWEGG'S FEES ......................................................................28

   A.  SFA's Case Has No Merit....................................................29

      1.  The Correct Claim Construction Analysis Precludes Infringement .....30

      2.  SFA's Claims Are Facially Invalid for Indefiniteness ........................38

   B.  SFA Filed and Maintained this Lawsuit in Bad Faith.............................44

      1.  SFA Brought this Case for the Improper Purpose of Obtaining
        Nuisance-Value Settlements ................................................45

      2.  Nuisance Litigation is Exceptional and Egregious ...............................49

      3.  Nuisance Litigation Should be Strongly Discouraged.........................52

II. AT A MINIMUM, THIS CASE MUST BE REMANDED BECAUSE THE DISTRICT
    COURT DID NOT CONSIDER THE TOTALITY OF THE CIRCUMSTANCES.............55

   A.  The District Court Ignored Most of the Evidence of SFA's Bad Faith ...56

   B.  The District Court Refused to Consider Newegg's Arguments on the
        Merits of the Case ..................................................................57

**CONCLUSION**..............................................................................61

**ADDENDUM** ...............................................................................63

## CONFIDENTIAL MATERIAL OMITTED

The material omitted on pages 8, 25, and 45 reflects the terms of settlement agreements that were designated as confidential by SFA, and are subject to a protective order entered by the district court.

# TABLE OF AUTHORITIES

## *Cases*

*Am. Standard, Inc. v. York Int'l Corp.*,
  244 F. Supp. 2d 990 (W.D. Wis. 2002).................................................45

*Amsted Indus. v. Buckeye Steel Castings Co.*,
  23 F.3d 374 (Fed. Cir. 1994) ................................................................49

*Artese v. Academy Collection Service,* No. 3:96-cv-2546-GLG,
  2000 U.S. Dist. LEXIS 1186 (D. Conn. Jan. 18, 2000)................................. 46, 53

*Brooks Furniture Manufacturing, Inc. v. Dutailier International, Inc.*,
  393 F.3d 1378 (2005) ............................................................................55

*Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*,
  532 U.S. 598 (2001) ..............................................................................59

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
  358 F.3d 1371 (Fed. Cir. 2004) ............................................................40

*Chimie v. PPG Indus. Inc.*,
  402 F.3d 1371 (Fed. Cir. 2005) ............................................................35

*Colombrito v. Kelly*,
  764 F.2d 122 (2d Cir. 1985)..................................................................47

*Comark Comm'ns, Inc. v. Harris Corp.*,
  156 F.3d 1182 (Fed. Cir. 1998) ............................................................41

*Cooter & Gell* v. *Hartmarx Corp.*,
  496 U.S. 384 (1990) ..............................................................................28

*CSIRO v. Lenovo (United States) Inc. et al.*,
  No. 6:09-cv-00399-LED (E.D. Tex. September 9, 2009)....................................23

*Eon-Net LP v. Flagstar Bancorp,*
  653 F.3d 1314 (Fed. Cir. 2011) ................................................. 45, 52

*Function Media, L.L.C. v. Google Inc.*,
708 F.3d 1310 (Fed. Cir. 2013) ........................................................................28

*Highmark Inc. v. Allcare Health Mgmt. Sys.*, 134 S. Ct. 1744 (2014) ............ *passim*

*HTC Corp. v. IPCom GmbH & Co., KG*,
667 F.3d 1270 (Fed. Cir. 2012) ............................................................. 42, 43, 44

*Ingenuity 13, LLC v. Doe*, No. 2:12-cv-8333-ODW,
2013 U.S. Dist. LEXIS 64564 (C.D. Cal. May 6, 2013) ................................ 48, 49

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
430 F.3d 1377 (Fed. Cir. 2005) .................................................................... *passim*

*Katz Interactive Call Processing Patent Litig. v. Am. Airlines, Inc.*,
639 F.3d 1303 (Fed. Cir. 2011) ............................................................. 40, 41, 42

*Kilopass Tech., Inc. v. Sidense Corp.*,
738 F.3d 1302 (Fed. Cir. 2013) ....................................................... 28, 50, 57, 58

*MarcTec, LLC v. Johnson & Johnson*,
664 F.3d 907 (Fed. Cir. 2012) ............................................................. 27, 49, 51

*Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*,
603 F.3d 943 (Fed. Cir. 2010) ........................................................................50

*Microsoft Corp. v. Multi-Tech Systems Inc.*,
357 F.3d 1340 (Fed. Cir. 2004) ............................................................. 32, 33, 35

*Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.*,
726 F.3d 1359 (Fed. Cir. 2013) ............................................................. 46, 47, 48

*MySpace, Inc. v. GraphOn Corp.*,
672 F.3d 1250 (Fed. Cir. 2012) ........................................................................31

*Netword, LLC v. Central Corp.*,
242 F.3d 1347 (Fed. Cir. 2001) ........................................................................31

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ........................................................................................36

*Norian Corp. v. Stryker Corp.*,
    432 F.3d 1356 (Fed. Cir. 2005) ...........................................................37

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    134 S. Ct. 1749 (2014) ................................................................ *passim*

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) ...........................................................35

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................................... 34, 35

*Rembrandt Data Techs., LP v. AOL, LLC*,
    641 F.3d 1331 (Fed. Cir. 2011) ............................................. 39, 40, 44

*Schindler Elevator Corp. v. Otis Elevator Co.*,
    593 F.3d 1275 (Fed. Cir. 2010) ...........................................................37

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001) ...........................................................33

*SFA Systems, LLC v. Amazon.com, Inc. et al.*,
    Case No. 6:11-cv-00052-LED (E.D. Tex.) ...........................................9

*Summit Data Sys. v. Emc Corp.*, No. 10-749-GMS,
    2014 U.S. Dist. LEXIS 138248 (D. Del. Sep. 25, 2014).......................46

*United States v. Adams*, 383 U.S. 39 (1966)...........................................31

*Upthegrove v. Health Prof'ls, LTD.*, No. 07-cv-0596-BBC,
    2009 U.S. Dist. LEXIS 4546 (W.D. Wis. Jan. 21, 2009) .....................48

### *Statutes*

28 U.S.C. § 1295(a)(1)............................................................................1

28 U.S.C. § 1331 .....................................................................................1

28 U.S.C. § 1338(a) ................................................................................1

28 U.S.C. § 1920......................................................................................5

28 U.S.C. § 2107(a) ................................................................1

35 U.S.C. § 101 ....................................................................43

35 U.S.C. § 285 .............................................................. *passim*


### Rules

Federal Rule of Appellate Procedure 4 ....................................................1


### Other Authorities

Colleen V. Chien, *Patent Trolls by the Numbers*,
   Santa Clara University Studies Research Paper No. 08-13,
   *available at* http://ssrn.com/abstract=2233041 (March 13, 2013) .......................49

## STATEMENT OF RELATED CASES

No other appeal in or from this same civil action was previously before this Court or any other court of appeals. SFA Systems is currently asserting the patents-in-suit in the following civil actions, all of which are pending in the Eastern District of Texas:

*SFA Systems, LLC v. Blockbuster, Inc.*, No. 6:2010-cv-00523;
*SFA Systems, LLC v. eBay, Inc.*, No. 6:2014-cv-00171;
*SFA Systems, LLC v. Lowe's Companies, Inc. et al.*, No. 6:2014-cv-00172;
*SFA Systems, LLC v. Mastercard, Inc.*, No. 6:2014-cv-00173;
*SFA Systems, LLC v. Sony Electronics, Inc.*, No. 6:2014-cv-00174;
*SFA Systems, LLC v. Staples, Inc.*, No. 6:2014-cv-00175;
*SFA Systems, LLC v. Visa, Inc.*, No. 6:2014-cv-00176;
*SFA Systems, LLC v. Wal-Mart Stores, Inc. et al.*, No. 6:2014-cv-00177;
*SFA Systems, LLC v. Certona Corp.*, No. 6:2014-cv-00702;
*SFA Systems, LLC v. Dell, Inc.*, No. 6:2014-cv-00703;
*SFA Systems, LLC v. The Walt Disney Co.*, No. 6:2014-cv-00704;
*SFA Systems, LLC v. Google, Inc.*, No. 6:2014-cv-00705;
*SFA Systems, LLC v. Groupon, Inc.*, No. 6:2014-cv-00706;
*SFA Systems, LLC v. Hotels.com, L.P.*, No. 6:2014-cv-00707;
*SFA Systems, LLC v. Netflix, Inc.*, No. 6:2014-cv-00708;
*SFA Systems, LLC v. Yahoo!, Inc.*, No. 6:2014-cv-00709.

Newegg and its undersigned counsel are unaware of any other actions now pending in this or any other court that may directly affect or be directly affected by this Court's decision in the present appeal.

## JURISDICTIONAL STATEMENT

This is an appeal from the district court's final order, dated July 7, 2014, denying Newegg's motion for attorneys' fees and experts' fees. The district court had original jurisdiction under 28 U.S.C. §§ 1331, 1338(a). Newegg filed a timely notice of appeal under 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.     Whether the district court erred by failing to find this case:

(a) exceptional under 35 U.S.C. § 285 to award attorneys' fees; and

(b) egregious under its inherent authority to award expert fees;

despite clear and unrebutted evidence showing that this lawsuit was meritless, and that it was filed and prosecuted to leverage the high cost and burden of litigation to coerce a cost-of-defense settlement payment from Newegg.

2.     Whether the district court properly considered the totality of the circumstances, including the strength of SFA's litigation positions, as required under *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014), before finding this case not to be exceptional.

# STATEMENT OF THE CASE

## I.    PROCEDURAL HISTORY

SFA Systems, LLC ("SFA") brought this action in July 2009 against 27 online-retailer defendants, including Newegg Inc. ("Newegg"), alleging that certain sales and marketing features of Newegg's website www.newegg.com infringed SFA's United States Patent No. 6,067,525 ("the '525 Patent").  A1000, A1014.  All but six defendants settled with SFA.  A0074-A0117. In August 2011, SFA filed another lawsuit against the six remaining defendants, asserting SFA's related U.S. Patent No. 7,941,341 ("the '341 Patent").  A2568-A2569.  By October 2011 Newegg was the only defendant left in either case, and the two actions were consolidated.  A2568-A2569; A0074-A0117.

A first *Markman* hearing was held on April 5, 2011 to construe terms of the '525 Patent.  A2295-A2299.  Magistrate Judge Love issued a *Markman* order on August 8, 2011 which was subsequently adopted over Newegg's objections, with one minor clarification, by Chief Judge Davis.  A0051-A0073, A0049-A0050 ("the '525 *Markman* Order").

The parties proceeded with discovery leading up to expert disclosures. A2454-A2455.  SFA moved to extend the expert deadline from October 3, 2011 to October 17, 2011, and the district court ordered the parties to resolve the motion. A0107.  Then, on October 21, 2011, before any expert reports were served, SFA

filed a motion (joined by Newegg) to consolidate its two actions and proposed extending all approaching deadlines by approximately ten months.  A2579.  After the cases were consolidated in October 2011, a schedule was entered that effectively restarted the litigation.  A0108-A0109; A2591-A2596.

A second *Markman* hearing was held on October 23, 2012 concerning disputed terms of the '341 Patent.  A3475-A3478.  Newegg also filed a motion for summary judgment of indefiniteness in parallel with the *Markman* proceedings.  A3223-A3365.

While the district court was considering the claim construction and indefiniteness issues, discovery progressed in Newegg's case, as well as in another co-pending case of SFA's against Amazon.com (Civil Action No. 6:2011-cv-00052 (E.D. Tex.), "the Amazon Litigation").  When the expert deadlines were again looming in Newegg's case, SFA approached Newegg requesting Newegg's consent to move the district court to stay the Newegg case "until after the Amazon trial, or at least for some period of time" because "[f]rom our point of view it is a much larger case in terms of damages we're going to be seeking."  A3797-A3798.  Newegg agreed to join SFA in a motion that was filed on March 11, 2013—not to stay the case, but to push back the trial date and other pre-trial deadlines by five months, except that the expert deadlines were only pushed back about two weeks.  A3590-A3599 (citing trial and pre-trial scheduling conflicts with the Amazon

Litigation and another case). The motion was denied as premature on March 15, 2013 because trial was more than six months away. A3600. At that time, opening expert reports were due in less than a month. A3590-A3599 (indicating that opening expert reports were due on April 12, 2013).

On March 27, 2013, Newegg received a "walk away" settlement offer from SFA, each side to mutually dismiss the case and bear its own fees and costs. A3633-A3636. Newegg rejected the offer because it did not "compensate Newegg for the considerable costs and fees incurred in defending the litigation." A3633-A3636.

On April 11, 2013, the district court issued its *Markman* order concerning the '341 Patent, and at the same time denied Newegg's motion for summary judgment of indefiniteness. A0007-A0048 ("the '341 *Markman* Order"). The next day, SFA moved to dismiss its case against Newegg, with prejudice, and covenanted not to sue Newegg on its patents (thereby extinguishing jurisdiction over Newegg's declaratory judgment counterclaims). A3608-A3616. In the motion to dismiss, SFA also contended that Newegg should be denied an opportunity to seek costs and fees from SFA. A3612-A3613. Newegg consented to the dismissal with prejudice of all claims and counterclaims, as well as the covenant not to sue, but opposed the portion of SFA's motion that sought to preemptively deny Newegg its costs and fees. A3621-A3688.

The district court ultimately permitted Newegg to file motions for fees and costs.   A3705.   Newegg subsequently filed a motion for costs pursuant to 28 U.S.C. § 1920 and a motion for attorneys' fees, expert fees, and nontaxable costs pursuant to 35 U.S.C. § 285 and the district court's inherent authority.   A0115, A3706-A5093.

As discussed in more detail below, Newegg argued in its fee motion that SFA's lawsuit was baseless, and was brought and prosecuted in bad faith, both of which were required to be shown under then-governing law.   A3706-A5093. However, Newegg also "question[ed] the propriety of requiring proof of both objective baselessness and bad faith," characterizing such a test as "inflexible, disproportionately burdensome on defendants, and . . . not permit[ting] the totality of the circumstances to be considered to award fees where justice requires in the sound discretion of the district court."   A3718-A3719 (citing *Octane Fitness certiorari* petition).

While Newegg's motions for costs and fees were pending, the Supreme Court decided *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014), which relaxed the standard for finding a case "exceptional" under Section 285.   Newegg filed a Notice of Subsequent Authority explaining the key and pertinent holdings of the decision, and argued that "for the same reasons

expressed in [Newegg's fee motion], this case 'stands out from the others' in a manner that warrants a finding of exceptionality and an award of fees." A5200-01.

The district court granted Newegg's motion for costs in the amount of $46,743.56, deeming Newegg the prevailing party and thus presumptively entitled to its taxable costs—a presumption that SFA failed to rebut. A0116. Newegg's motion for fees was denied. A0001-A0006. This appeal followed.

## II.    FACTUAL BACKGROUND

### A.    Preliminary Statement

Unable to squeeze a settlement from Newegg after nearly four years of litigation, patent assertion entity SFA suddenly decided that, for "business reasons," it would rather dismiss Newegg with prejudice than risk this case being resolved on the merits in Newegg's favor.

SFA never genuinely believed that Newegg infringed its patents, nor could it. The patents cover computerized systems and methods designed to assist human salespeople in a real-world sales process, which obviously do not exist in fully automated online retail websites like www.newegg.com. Claims asserted by SFA were also facially invalid for reciting method steps within system claims, rendering the claims indefinite as a matter of law.

SFA never intended to pursue this case to trial or even to the point of expert disclosures. The filing and prosecution of this action were solely intended to extort

cost-of-defense settlement fees from defendants, not to resolve any legitimate infringement claims. Because Newegg would not pay to settle, when trial was finally approaching SFA cut and ran to avoid putting its patents in jeopardy.

By the time Newegg filed its fee motion, SFA's baseless and bad faith lawsuit forced Newegg to spend more than $1.2 million in legal fees and expenses that Newegg should never have incurred. This figure does not include the considerable additional expense of the fee motion briefing and the present appeal.[1]

Defendants willing to contest meritless claims rather than succumb to the prospect of a nuisance settlement serve as important safeguards against abuse. With the proliferation of mass patent litigation seeking quick, nuisance settlements from many targets without a genuine intent to pursue the case on the merits, this safeguard is particularly important because such broadside abuses sour opinion leaders and the public on the patent system. Yet, unless fees are shifted in cases such as this one, the decision to incur big expenses to defend meritless cases, rather than paying a fraction to settle, become so unattractive that there will be even less resistance to this cynical but successful patent monetization approach.

---

[1] Newegg seeks recovery of all its fees and expenses, including those incurred during and subsequent to its fee briefing before the district court. *See* A3711, n. 3.

CONFIDENTIAL MATERIAL OMITTED

B.    <u>The Parties and the Patent Litigation</u>

Newegg is a prominent online-only retailer that primarily sells computers, computer components and peripherals, and consumer electronics. Newegg conducts its business primarily via <u>www.newegg.com</u>.

SFA is exclusively in the business of patent litigation. It follows the all-too-familiar model of using the burden and expense of patent litigation as leverage to extort settlement fees from defendants.

SFA has filed 21 civil actions since 2007 alleging infringement of the patents-in-suits, approaching 100 total defendants. The vast majority of defendants were retailers—especially those, like Newegg, with substantial online presence and presumptively deep pockets—who were merely users of the accused technologies, not the technology companies who make and sell software or hardware that implement the accused functionality.

Newegg, like many other SFA defendants, was served with a lawsuit and then approached by SFA to discuss settlement of the case. Nearly every retailer defendant settled for a dollar amount well under the cost of defense, most averaging around [[          ]], but often for [[          ]] or less. A3733.

While settling made business sense for other defendants, Newegg refused to settle because it believed, and continues to believe, that SFA's infringement allegations have no merit, and that defending against meritless litigation

discourages other meritless suits.  But SFA kept pressing this case for nearly four years, adding a new patent about half-way through, causing Newegg to incur more than $1.2 million in fees and expenses to defend itself.  A3735-A3759.  This $1.2 million cost of defense works out to an average of approximately $25,000 per month over the course of the litigation, and reflects vigorous cost management. Newegg had no alternative other than to pay SFA an amount it did not deserve for a patent Newegg believed strongly was invalid, and did not in any case infringe.

Newegg's unwillingness to settle cases it believes are without merit is well documented and publicized. *See, e.g.,* A3761-70; A3782-83.

As noted above, Amazon.com ("Amazon") was a defendant in a related co-pending case brought by SFA.  Amazon has settled with a number of plaintiffs where Newegg did not.  For example, Amazon paid $40 million to settle with Soverain Software, the same entity whose patents were ultimately invalidated on appeal by Newegg, *see* A3761-70, "just days before trial was set to begin." A3785-86.  Amazon also settled on the eve of trial in the Alcatel-Lucent USA case which Newegg defended and secured a complete defense verdict. A3782-83, A3793. Here, Amazon agreed to settle its case with SFA weeks before trial.  *SFA Systems, LLC v. Amazon.com, Inc. et al.*, Case No. 6:11-cv-00052-LED (E.D. Tex.), at ECF No. 532 (September 13, 2013 notice of settlement); *id.* at September 11, 2013 Docket Text Order (setting October 7, 2013 trial date).

The purported explanation for SFA's sudden lack of interest in pursuing Newegg was cryptically alleged to be "business reasons." A3613. SFA previously indicated that these "business reasons" were merely the desire to "focus on Amazon" since more potential damages were allegedly at stake in that case. A3798. More realistically, based on history and evidence, it was the prospect of a quick settlement check. SFA never furnished any evidence of its respective damages claims. As expert disclosures and trial in this case neared, SFA began taking steps to delay the litigation.

When SFA stated that it "determined that it did not make business sense to continue to pursue its suit against Newegg" (A3610), the underlying motivation was more than a lack of interest. SFA realized that Newegg would not settle while Amazon might, and that SFA would be forced to substantively litigate against Newegg. Dismissing Newegg was ostensibly SFA's best option to retain (or even increase) its settlement proceeds while continuing to keep the merits of its infringement allegations from being tested in court.

C.    The SFA Patents

The '525 Patent and '341 Patent (the "SFA Patents") are related patents sharing materially identical specifications. Independent claims 1, 20, and 40 of the '525 Patent and independent claims 1, 13, 27, and 32 of the '341 Patent were asserted against Newegg in this case.

The SFA Patents are directed to a system or method to be used by an actual salesperson to assist the salesperson in a real-world sales process. *See* '525 Patent, Abstract ("A salesforce automation system which integrates computerized, intelligent automated *salesperson support* for multiple phases of the sales process."). Various subsystems coordinate to help facilitate the sales process by assisting in functions such as generating sales leads and managing customer relationships. *Id.*

The SFA Patents teach that each of the four core subsystems of the invention are designed to be used by a salesperson:

> (1) "The lead generation component 102 is provided to *assist sales personnel* to identify leads, to generate qualified leads and to begin the sales process." '525 Patent, at 4:21-23.[2]
>
> (2) "The time with customer component 104 [is] automated to *assist sales personnel* in efficiently performing their function during this important phase of the sales process." *Id.* at 4:64-67.
>
> (3) "The order management component 106 *assists sales personnel* in efficiently managing the critical sales process phase that encompasses the time between the purchase decision and the time the product or service is delivered." *Id.* at 5:31-34.
>
> (4) "[T]he customer retention component 108 . . . *assists sales personnel* during the phase of the sales process after delivery of the service or product purchased by the customer." *Id.* at 5:66:6-3.

The term "salesperson" appears more than **150** times in the specifications, and is expressly recited in many claims. *See, e.g.,* '341 Patent, Claims 1 & 31 (claiming

---

[2] All emphasis in this brief is added unless specified to the contrary.

"a single system [of] tools *used by a salesperson* in a sales process"); '525 Patent, Claims 8-12 (claiming subsystems that "provide training *to a salesperson*," "*assist a salesperson* in managing sales information," and "*assist a sales manager* in managing a plurality of salespeople*").

Consistent with the specification, during prosecution the advantage of the invention repeatedly touted by the inventors was that it "improves the efficiency with which a salesperson completes sales transactions." A1748; A1757; *see also* A1758 (distinguishing prior art and arguing that by using the claimed invention "[s]alespeople can thereby conduct business with enhanced flexibility and versatility").

The specification and prosecution history faithfully reflect the intent of the inventors. Inventor Jerome Johnson testified that "my recollection is that we wanted to help the salespeople be as effective as possible." A1767, at 229:15-17. He later clarified that "[w]e weren't trying to automate salespeople. We were trying to help them be more effective." A3161, at 163:10-11. Mr. Johnson denied that it was ever his "goal to eliminate salespeople" with his invention. A3161, at 163:12-13.

SFA likewise emphasized the critical and central role of a salesperson in the patented inventions. In a prior litigation against sales force automation software company Infor Global Solutions ("the *Infor* Litigation"), SFA argued against a

motion for summary judgment of invalidity and took the position that "there is a presumption in the '525 Patent that the system is *aiding a salesperson* who is part of a sales force." A1685.[3] SFA argued that the prior art "does not disclose the limitation 'a sales system used to facilitate a sales process'" of claims 1, 20, and 40 of the '525 Patent because it does not disclose "*direct sales from salespersons* to end-user customers." A1674. To avoid summary judgment SFA previously argued that to anticipate the asserted claims the prior art must be "directed at *helping salespersons*." A1674.

In sum, the SFA Patents only disclose and cover systems and methods to support real-world sales efforts by human salespeople. Automated online shopping or e-commerce, without the presence of a salesperson, is not contemplated by the SFA Patents.

The SFA Patents briefly mention using kiosks and websites to gather information from potential customers for salespeople. The patents disclose using a computer kiosk "at public forums where the salesperson may not necessarily be present . . . to generate interest by the prospective customer and collect customer information," where the kiosk may be connected to a network. '525 Patent, at 11:38-45. Similarly, the patents mention that a website can "provide[] an interactive information supply to the Web site user" and to "collect[] information

---

[3] All emphases herein are added unless specified to the contrary.

13

about the user which is provided to the salesperson in the form of a lead." '525 Patent, at 11:48-54. But both of these functions are intended to gather information for the salesperson—they are passive with respect to the salesperson and do not automate the entire sales process. *See, e.g.,* '525 Patent, at 14:30-33, 14:48-49 (the website and kiosk are used to "facilitate the connection of lead information that can be provided to the appropriate salesperson.").

The kiosk and website functions disclosed are not embodiments of the entire system or method as claimed. They are one-way communication devices (customer to salesperson) that are not used to facilitate the claimed "sales process," which SFA and Newegg agreed is a "process . . . [for] *selling goods or services*." *See* A0011. The website and kiosk disclosed are not being used to actually sell anything, and nothing in the SFA Patents suggests any application of the systems and methods therein to online retail websites.

> D.    The District Court's Claim Constructions

Based on the claim language, specification, prosecution history, inventor testimony, and prior SFA litigation positions, Newegg argued that various terms of the SFA Patents required that the claimed system or method be used by salespeople or involve assisting salespeople. The district court read the claims as not requiring any participation, involvement, or use by a salesperson whatsoever.

1.    *The '525 Patent Markman Proceedings*

Newegg argued that the following terms should be construed not to extend beyond "salesperson support" systems:

| '525 PATENT CLAIM TERM | NEWEGG'S CONSTRUCTION |
|---|---|
| "a computer implemented sales system used to facilitate a sales process" (claims 1, 40) | "a computer providing salesperson support during a sales process" |
| "facilitating a sales process using a computer arrangement" (claim 20) | "using a computer providing salesperson support during a sales process" |

A1596.  The district court concluded that these two terms in the claims' preambles were "limiting in their entirety" because they provide antecedent basis for the term "sales process" in the body of the claims, and because the preambles give life, meaning, and vitality to the claims.  A0061-A0062 (explaining that "the preambles materially define the relationship between the 'sales *process*' and the computer *system* . . . provid[ing] essential context for understanding how the various claims differ") (emphasis in original).

The district court also held that no construction of these terms was required. A0062-A0063.  According to the district court, Newegg's proposed definitions were "not warranted based on the claims or specification."  A0062-A0063.  In the district court's view, "a salesperson is not literally required by the claims" and reading the claims as limited to salesperson assistance would exclude "other potential embodiments." A0063.   The district court did not identify the other

potential embodiments to which it was referring. Presumably, the district court was referring to the website and kiosk "embodiments" discussed above because they involve customers initiating actions and using certain ancillary system components. *See* A0059-A0060 (discussing customer uses and actions).

The district court did not hold SFA to its characterizations of the claimed invention in the *Infor* Litigation because, although it was distinguishing the prior art as "not directed at helping salespersons," SFA supposedly distinguished the prior art on other grounds as well. A0064 ("Those earlier arguments by SFA did not concern whether the claims were *confined* to salesperson interaction. In other words, SFA did not argue that the claims *only* cover salesperson interaction. SFA argued in the context of validity stating that Filepp does not disclose salesperson interaction—an embodiment that is undisputedly covered by the claims.") (emphasis in original).

### 2.    *The '341 Patent Markman Proceedings*

Newegg later offered the following constructions for terms in the '341 Patent:

| '341 PATENT CLAIM TERM | NEWEGG'S CONSTRUCTION |
|---|---|
| "sales process"<br>(claims 1, 13, 27, 32) | "a real life process of a salesperson selling goods or services, including two or more phases such as lead generation, time with customer, order management, and customer retention" |

| "automated sales system / computer implemented sales system" (claims 1, 27) | "computer system used to guide a salesperson or guide content to a salesperson automatically during multiple phases of a sales process" |
|---|---|

A2972-A2981.  The district court did not find the preambles of the '341 Patent claims to be limiting in their entireties.  A0040-A0042 (finding that "intelligently integrating" term of claims 1 and 31 is not "necessary to give meaning to the claim").  With the exception of the "intelligently integrating" term, however, the district court's prior analysis of the '525 Patent rendered the remainder of the preambles of the '341 Patent limiting.  Specifically, the '341 Patent claims' preambles provide antecedent basis for "sales process" and helpfully contrast elements of the sales process with elements of the computer or the system used in connection with the sales process.  *See, e.g.,* '341 Patent, at Claim 1 ("An automated sales *system* for facilitating a sale of an item or service by intelligently integrating into a single system tools used by a salesperson in a sales *process*, the automated sales *system* comprising: a plurality of *subsystems of a computer* configured to electronically facilitate one or more actions performed during at least one phase of the sales *process*").

The district court construed "sales process" as it had in the '525 Patent to mean "a process of selling goods or services, including two or more phases such as lead generation, time with customer, order management, and customer retention." A0014.  While recognizing that the sales process is a "real-world" activity, the

17

district court would not read the claimed "sales process" as requiring a salesperson. A0013-A0014. As in the prior *Markman* order, the district court believed that such a reading would "exclu[de] other potential embodiments." A0014. The district court noted that the kiosk and website disclosed in the specification involved computerized actions that were therefore not "real-world" events in the sales process, suggesting that the sales process cannot "exclude[] computer activity." A0013.

Applying essentially the same reasoning, the district court construed the terms "automated sales system / computer implemented sales system" in the preambles not to require the presence of or use by a salesperson, and held that the terms did not require any construction at all. A0017-A0018. The fact that the preamble of claim 1 expressly identified the system as comprising "tools used by a salesperson" made no difference.

After reconsidering SFA's statements in the *Infor* Litigation, the district court reiterated its belief that "SFA did not argue previously that the claims only cover salesperson interaction." A0014 ("SFA stopped short of stating the asserted *claims* require a sales person, indicating that SFA's statements regarding the salesperson refer to the disclosure and not to the asserted claims.") (emphasis in original).

E.    The Indefiniteness Summary Judgment Decision

In its indefiniteness briefing (A3223-36), Newegg noted that claim 1 of the

'525 Patent and claims 1 and 27 of the '341 Patent were system claims, but recited

and required the performance of method steps:

'525 Claim 1:    **A computer implemented sales system** used to facilitate a sales process, the system comprising:
> a plurality of subsystems configured to facilitate one or more actions performed during at least one phase of the sales process; and
> an event manager, coupled to the subsystems, the event manager
>> ***detecting* one or more changes** in state characteristic of an event occurring within the system,
>> ***inferring* occurrence of the event and a context** in which the event occurred based at least in part on the detected changes in state, and
>> **automatically *initiating* an operation** in one or more particular subsystems of the computer to facilitate a new action based on the inferred context.

'341 Claim 1:    **An automated sales system** for facilitating a sale of an item or service by intelligently integrating into a single system tools used by a salesperson in a sales process, the automated sales system comprising:
> a plurality of subsystems of a computer configured to electronically facilitate one or more actions performed during at least one phase of the sales process; and
> an event manager, electronically coupled to at least one subsystem of the plurality of subsystems, **the event manager *detecting* one or more changes** in information regarding an event occurring within the system **and automatically *initiating* an operation** in one or more particular subsystems of the computer to facilitate a new action based on the event,
>> wherein **at least one subsystem of the plurality of subsystems *determine*s** if the event has occurred previously in the sales process **and *updates*** another event or task in at least another

subsystem of the plurality of subsystems if the operation is automatically initiated.

'341 Claim 27:    **A computer implemented sales system** used to facilitate a sales process of an item or service, the system comprising:
  a plurality of subsystems configured to electronically facilitate actions performed during the sales process; and
  an event manager coupled to the subsystems and configured to:
    detect one or more changes in information of an event occurring in the system,
    link the event with an action to be performed during the sales process based on prior sales experience using the sales system, and
    automatically initiate an operation using at least one subsystem of the plurality of subsystems to facilitate the action to be performed based on the inferred context,
    **wherein at least one subsystem of the plurality of subsystems _determines_** if the event has occurred previously in the sales process **and _updates_** another event or task in at least another subsystem of the plurality of subsystems if the operation is automatically initiated.

In seeking summary judgment that these claims are facially invalid, Newegg explained that "reciting both an apparatus and a method of using that apparatus renders a claim indefinite under section 112, paragraph 2. . . . [S]uch a claim is not sufficiently precise to provide competitors with an accurate determination of the metes and bounds of protection involved and is ambiguous and properly rejected under section 112, paragraph 2." *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005); A3224-25.

The district court denied Newegg's motion, holding that the claims were not indefinite. Although recognizing the rule of *IPXL*, the district court held that these

claims merely recited capabilities of the claimed systems akin to "configured to" language, and did not "suffer[] from a true ambiguity as to whether the claims require building a product or performing a method." A0037-A0038. According to the district court, the action verbs like "detecting" and "initiating" were "functional language [that] merely describes the functional capability of the claimed structures" such that infringement "plainly occurs when a system is created that can perform the claimed functions." A0038. The district court ignored the fact that the claims at issue each expressly include "configured to" language indicative of capability, separate from and in contrast to the method steps recited as action verbs noted above.

### F.   Newegg's Fee Motion

Newegg's fee motion began by explaining SFA's business model and its history of broad patent assertions and nuisance-value settlements. A3710-11. Newegg explained the background of the litigation, including SFA's sudden and strong desire to delay (and ultimately dismiss) its case against Newegg. A3711-A3714. The contrast between Amazon.com and Newegg in terms of settlement posture in past cases was highlighted, and the motivation behind SFA's expressed desire to "focus on Amazon" was examined. A3712-13.

With reference to the *Markman* briefing, Newegg called out SFA for having "stretched the enforcement of its patents far beyond the scope of the purported

invention described therein and accused Newegg and many other online retailers—
who use a sophisticated website shopping platform instead of salespeople—of
infringement." A3723 (explaining that "the claims of SFA's patents are directed to
real world processes involving actual salespeople interacting with customers . . .
not online commerce conducted entirely via a website"). With reference to the
summary judgment briefing, Newegg emphasized the facial indefiniteness of
SFA's hybrid system-method claims. A3723.

In denying Newegg's motion, the district court began by noting the Supreme
Court's intervening *Octane Fitness* decision, which changed the test for
exceptionality under Section 285, and held that no additional briefing was required
for Newegg's motion to be decided. A0001-02. After summarizing the parties'
positions, the district court first addressed SFA's business model, holding that "the
fact that SFA has filed several lawsuits against numerous defendants is insufficient
to render this case exceptional. In many cases, patent infringement is widespread
and the patent owner may be forced to revert to widespread litigation against
several infringing parties to enforce its intellectual property rights." A0004. The
district court explained this proposition in a footnote: "For example,
Commonwealth Scientific and Industrial Research Organisation ["CSIRO"] has
been involved in litigation before this Court since 2005, including 16 separate
actions and infringement claims against over 36 separate parties." A0004.

The district court did not further explain how CSIRO, the Australian government agency for scientific research, was supposedly an apt analogue to SFA. CSIRO has indeed filed several lawsuits in the Eastern District of Texas. Unlike the end-users SFA targets, CSIRO's lawsuits accused various electronic hardware manufacturers such as Lenovo, Sony, and Toshiba of infringing U.S. Patent No. 5,487,069, which allegedly covers the manufacture, sale, and use of products practicing IEEE 802.11 standard for wireless local area networks. *See, e.g., CSIRO v. Lenovo (United States) Inc. et al.*, No. 6:09-cv-00399-LED (E.D. Tex. September 9, 2009), at ECF No. 1, ¶¶ 6-7. It does not appear that the district court relied on the CSIRO cases for the relative strength of the infringement allegations, any bad faith, or settlement activities as compared to SFA and this case. Although the district court implied that "infringement is widespread" of both CSIRO's and SFA's patents, it cited nothing to support such an assertion. A0004.

The district court did not weigh the importance of the timing of SFA's dismissal on the verge of expert disclosures, the motivation behind SFA's expressed desire to focus its efforts on the Amazon Litigation, the dollar values of SFA's settlement agreements, or Newegg's principled refusal to pay SFA nuisance value to settle the case contrasted with Amazon's settlement history. *See generally* A3710-14. Rather than examine all of these arguments and the associated evidence, and then weighing all the evidence together, the district court collapsed

them into a single straw man and merely stated the facially unobjectionable view that "the fact that SFA has filed several lawsuits against numerous defendants is insufficient to render this case exceptional." A0004.

The district court also held that "Newegg has provided no evidence that this case stands out from others with respect to the substantive strength of [SFA's] litigating position." A0004. Newegg's previously rejected claim construction and indefiniteness arguments were characterized as "bare allegations . . . insufficient to render this an exceptional case." A0004.

The district court did not comment with any more specificity on the merits of the case because, in the district court's view, the timing of the dismissal rendered a more searching inquiry inappropriate. With no citation, the district court announced a rule that "[f]or a case dismissed before trial to be designated exceptional, evidence of the frivolity of the claims must be reasonably clear without requiring a 'mini-trial' on the merits for attorneys' fees purposes." A0004-05. Because Newegg allegedly did not meet this burden, the district court denied Newegg's fee motion under Section 285.

The district court also summarily denied Newegg's motion for expert fees under the district court's inherent authority. According to the district court, "[s]ince Newegg failed to show this case was exceptional under the new, lower standard— much less the more stringent exceptional test of *Brooks Furniture*—there is no

CONFIDENTIAL MATERIAL OMITTED

justification to invoke the Court's inherent power to impose a sanction of attorneys' fees here."  A0005.

## SUMMARY OF THE ARGUMENT

SFA sued Newegg and scores of other targets for the improper purpose of seeking nuisance-value settlement payments.  This patent lawsuit had nothing to do with any bona fide complaint of infringement.  Newegg should be reimbursed for its expenses contesting this meritless case.

Every settlement other online retailers paid to SFA for its patent was for a small fraction of the cost of defense, averaging around [[          ]], but often [[          ]], and almost always a round number.  Newegg refused to pay to settle because SFA was abusively accusing website functions that did not, and could not, infringe the patents-in-suit, and because SFA was merely using the high cost of litigation defense to leverage nuisance settlements.  For justice to be done, somebody had to challenge SFA's baseless case and extortive patent litigation practices.  Newegg accepted the task.

SFA's patent covers a computerized system that must be used by a human salesperson, to assist that salesperson.  But it is undisputed that Newegg's business is online-only, and involves no salespeople.  This impossibility of infringement was apparent when the lawsuit was filed.   Yet SFA pursued the case anyway because proving infringement was never the point of this lawsuit.

After extensive and burdensome discovery, including expert discovery, after nearly four years of litigation SFA simply walked away.  Finally conceding that its shakedown efforts against Newegg were futile, SFA dismissed its case with prejudice and avoided having to back up its allegations in court.  All told, Newegg wasted more than $1.2 million in attorneys' fees and expert fees at the time of Newegg's fee motion, plus the considerable additional expenses of the fee motion itself, as well as this appeal.

Unlike its many co-defendants who settled with SFA and further funded SFA's nuisance litigation campaign against remaining defendants, Newegg took the expensive path and defended against SFA's baseless and bad faith infringement assertions.  Companies that are willing to help weed out bad actors by challenging frivolous patent assertions should not be left with no realistic recourse for enduring such injustice.  The protection of Section 285 is a critical safeguard to protect the system against the type of cynical, nuisance patent litigation that has given patent litigation a bad name in some quarters.   The business model of using meritless patent claims to extract nuisance payments from a broad cross-section of small businesses is, by design, normally kept out of this Court's view.   If fee shifting is denied in this type of case, the sharp practices on display here will stay in the shadows of confidential nuisance settlements rather than being exposed in the light

or fair adjudication.   Companies such as Newegg will have that much less incentive to contest nuisance-settlement claims.

Nuisance litigation like SFA's must not be encouraged, and SFA should not immunized from fee-shifting merely because SFA eventually dismissed the case. Although bad faith nuisance litigation is commonplace among today's patent litigants, litigants are required to litigate in good faith.   Because SFA did not litigate in good faith, this case "stands out from the others" and is exceptional under *Octane Fitness*, and is also sufficiently egregious to warrant expert fee shifting.  This Court should declare as much and order SFA to pay Newegg's fees.

## STANDARD OF REVIEW

The denial of a motion for attorneys' fees under 35 U.S.C. § 285 is reviewed for abuse of discretion.  *Highmark Inc. v. Allcare Health Mgmt. Sys.*, 134 S. Ct. 1744, 1747 (2014) ("[A]n appellate court should review all aspects of a district court's §285 determination for abuse of discretion.").

A district court's decision not to award expert fees under its inherent authority is also reviewed for an abuse of discretion.  *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 921 (Fed. Cir. 2012).

"The abuse-of-discretion standard does not preclude an appellate court's correction of a district court's legal or factual error: 'A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the

law or on a clearly erroneous assessment of the evidence.'" *Highmark*, 134 S. Ct. at 1748 n. 2 (quoting *Cooter & Gell* v. *Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

When a district court's fee determination is "premised on an incorrect legal standard," the decision must be vacated and remanded for consideration under the correct law. *Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1310, 1317-18 (Fed. Cir. 2013) (vacating and remanding because district court's analysis was "incomplete" and "inappropriately narrow" by failing to "address[] the objective merits of [the plaintiff's] claims").

"Claim construction and indefiniteness determinations are reviewed without deference." *Function Media, L.L.C. v. Google Inc.*, 708 F.3d 1310, 1316 (Fed. Cir. 2013).

## **ARGUMENT**

## I.    THIS CASE IS EXCEPTIONAL AND EGREGIOUS, AND SFA SHOULD PAY NEWEGG'S FEES

The district court abused its discretion by not finding this case exceptional and egregious to warrant fee shifting.

The district court should have recognized that SFA's case was meritless. The district court did not expla in its reasoning regarding the merits or strength of SFA's case other than to say "Newegg failed to meet [its] burden." To the extent its decision was based on the prior claim construction and summary judgment rulings, those rulings cannot stand because they were based on an erroneous view

of the law and a plainly incorrect evaluation of evidence. *Highmark*, 134 S. Ct. at 1748 n. 2.

The evidence proffered by Newegg also clearly demonstrates SFA's bad faith, and SFA introduced no countervailing evidence whatsoever of good faith. To credit SFA's self-interested professions of good faith over Newegg's evidence to the contrary was error.

Looking at the totality of the circumstances, this case cannot be viewed as anything but exceptional and egregious. Newegg should have been awarded its attorney's fees under Section 285 and expert fees under the district court's inherent authority. The district court abused its discretion by finding otherwise, and should be reversed.

A.    SFA's Case Has No Merit

Because this case ended with SFA's unilateral dismissal, there was no final substantive ruling on the merits such that a judgment on the merits could be appealed to this Court. In order to determine whether the district court abused its discretion in refusing to award fees, this Court must review the underlying substantive decisions of the district court as a predicate for analyzing this appeal of Newegg's fees motion. Absent meaningful review of those substantive decisions, plaintiffs could file frivolous cases in front of judges or courts that typically deny summary judgment or defer deciding summary judgment motions until the last

minute before trial.  Without prompt merits rulings that can be appealed, plaintiffs can more easily coerce nuisance value settlements.  Shining a light on the underlying merits issues in such cases (including claim construction rulings) is the only way to expose plaintiffs with meritless cases, who sue large number of defendants seeking settlements well under the cost of litigation, and then walk away before the merits of their cases are truly tested.  This Court's review of the underlying meritless substantive positions taken by such plaintiffs is especially warranted in cases where those plaintiffs unilaterally dismiss their cases prior to any final decision on the merits that could be reviewed (and, if erroneous, corrected) by this Court.

A closer evaluation by this Court will reveal that the district court erred in not unveiling SFA's meritless case for two major reasons.  First, the district court incorrectly construed the claims and read them to be much broader than permitted under this Court's law.  And second, the district court clearly misapplied this Court's precedent in denying Newegg's motion for summary judgment of indefiniteness on patent claims that were unmistakably hybrid method-apparatus claims.

1.    *The Correct Claim Construction Analysis Precludes Infringement*

Under controlling claim construction precedent, SFA's claims all require a system designed to assist salesperson or be used by a salesperson.  Had this correct

construction been given, Newegg, being an online-only retailer and having no salespeople to speak of, could not possibly infringe.

The claims, specification, prosecution history, inventor testimony, and even SFA's own statements in prior litigation make clear that the invention claimed in SFA's patents is solely and exclusively intended to be used by salespeople to assist salespeople in a real-world sales process. The scope of the claims must be restricted accordingly.

Courts must base claim constructions on "what was invented, and what exactly was claimed." *MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1256 (Fed. Cir. 2012). An inventor can claim only "what he has *invented*, but no more." *Id*. To determine what was invented, the entire patent must be examined giving "particular attention to the specification." *Id*. In that regard, preferred embodiments can suggest what the inventors actually intended the invention to encompass. *Id.* at 1257. Of course, inventors are always entitled to claim less than what was invented. *Id.* at 1256. But the claims cannot "enlarge what is patented beyond what the inventor has *described as the invention*." *Netword, LLC v. Central Corp*., 242 F.3d 1347, 1352 (Fed. Cir. 2001); *see also United States v. Adams*, 383 U.S. 39, 49 (1966) ("Claims are to be construed in the light of the specifications and both are to be read with a view to *ascertaining the invention*.").

When the specification broadly characterizes the overall invention as including particular features, the claims are properly construed to include those features, even though they may not be expressly recited in the claims. *See Microsoft Corp. v. Multi-Tech Systems Inc.*, 357 F.3d 1340, 1347-49 (Fed. Cir. 2004) (claims required transmission over telephone lines even though the claims did not recite such language because the specification, particularly the "Summary of the Invention," broadly described "the overall inventions of all three patents" as enabling communications over a telephone line).

The term "salesperson" appears more than **150** times in the SFA Patent specifications in connection with every embodiment of the disclosed "salesperson support system," and is expressly recited in many claims. The Abstracts of the SFA Patents indicate that the invention is "[a] salesforce automation system which integrates computerized, intelligent automated *salesperson support* for multiple phases of the sales process." '525 Patent, Abstract' '341 Patent, Abstract. The Background of the Invention and Field of the Invention sections begin: "The present invention is directed to a sales force automation system . . . intelligently integrating into a single system *tools used by a salesperson* in the sales process." '525 Patent, 1:5-9; '341 Patent, at 1:28-32. Just like the patents in *Microsoft* "broadly describe[d] the overall inventions" by "repeatedly and consistently" describing the systems disclosed as communicating over a telephone line, SFA's

patents could not be clearer or more emphatic that the invention disclosed is a salesperson support system, designed and intended for use by salespeople. *Microsoft*, 357 F.3d at 1347-49 (reading a telephone line requirement into the claims, explaining that "[i]n light of those clear statements in the specification that the invention ('the present system') is directed to communications 'over a standard telephone line,' we cannot read the claims . . . to encompass data transmission over a packet-switched network such as the Internet.").

The district court in this case refused to follow this clear precedent and reach the "inescapable conclusion" that the SFA Patents are exclusively directed to salesperson support systems. *Microsoft*, 357 F.3d at 1348 (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) (holding that specifications led to 'inescapable conclusion' that the claimed invention required coaxial lumens, even though the claim language did not recite coaxial lumens).

The mere fact that "a salesperson is not literally required by the claims" cannot support the district court's overbroad reading of the claims as encompassing fundamentally different systems in violation of *Microsoft*. A0063. To suggest that reading the claims to reflect the correctly narrow intended scope would exclude "other potential embodiments" fails to grapple with the actual specification disclosure. A0063; A0013-14. The supposed "other potential embodiments" the

district court sought not to exclude from the claims are not "embodiments" of the claimed invention at all. They are information-receiving kiosks and websites that are used in connection with the salesperson support system invention, not in place of it. *See, e.g.,* '525 Patent, at 14:30-33, 14:48-49 (explaining that the website and kiosk are used to "facilitate the connection of lead information that can be provided to the appropriate salesperson.").

Evidence outside of the specification, including prosecution history and inventor testimony, may also be used to determine the proper meaning of the claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316-17 (Fed. Cir. 2005) ("Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and *intended* to envelop with the claim."). Here, the advantage of the invention stated during prosecution was that it "improves the efficiency with which a salesperson completes sales transactions" and provides "enhanced flexibility and versatility" for salespeople. A1748; A1757-58. The inventor testified that "my recollection is that we wanted to help the salespeople be as effective as possible." A1767, at 229:15-17; *see also* A3161, at 163:10-11.

The statements made during prosecution reflect an unambiguous disclaimer of any claim scope that would extend to non-salesperson embodiments. As this Court has explained, "the prosecution history can often inform the meaning of the

claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005); *see also Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution."). If the "patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of surrender." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). The significance of the statements concerning the invention made during prosecution is bolstered "by the fact that . . . [they were] made in an official proceeding in which the patentee had every incentive to exercise care in characterizing the scope of its invention." *Microsoft*, 357 F.3d at 1350. It was an abuse of discretion for the district court to ignore these clear and unambiguous disclaimers of claim scope.

Many years later SFA reaffirmed the salesperson-centric nature of its patents in the *Infor* Litigation, stating that "there is a presumption in the '525 Patent that the system is *aiding a salesperson* who is part of a sales force." A1685. SFA argued that the prior art does not disclose "*direct sales from salespersons* to end-

user customers," and explained to the district court that to anticipate the asserted claims the prior art must be "directed at *helping salespersons*." A1674.

The district court abused its discretion by failing to estop SFA from making arguments against Newegg that were fundamentally inconsistent with those made against Infor to defeat a summary judgment motion. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . . This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."). As to Infor, a sales force automation software company, SFA was content limiting its patents to salespeople. However, when suing online retailers that lack salespeople SFA suddenly took the position that "nowhere does the specification state that the claimed sales system must be used by a salesperson." A3424. The district court abused its discretion in allowing SFA to make such arguments.

According to the district court, SFA's statements in the *Infor* Litigation should not be used to limit claim scope because SFA was supposedly distinguished the prior art on other grounds as well. A0064 ("SFA did not argue that the claims *only* cover salesperson interaction. SFA argued in the context of validity stating

36

that Filepp does not disclose salesperson interaction—an embodiment that is undisputedly covered by the claims.") (emphasis in original).[4]

It is well established, however, that "[a] disclaimer cannot be avoided simply by pointing out that the prior art could have been distinguished on another ground." *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1288 (Fed. Cir. 2010) (citing *Norian Corp. v. Stryker Corp.*, 432 F.3d 1356, 1361-63 (Fed. Cir. 2005) ("[I]t frequently happens that patentees surrender more through amendment than may have been absolutely necessary to avoid particular prior art. In such cases, we have held the patentees to the scope of what they ultimately claim, and we have not allowed them to assert that claims should be interpreted as if they had surrendered only what they had to."). Even if SFA's statements were intended to distinguish the prior art in the *Infor* Litigation on multiple grounds, only one of which was the requirement of a salesperson, SFA would still have disclaimed non-salesperson embodiments, including online-retail websites such as Newegg's, from the scope of its claims.

The district court's failure to correctly apply binding claim construction precedent allowed SFA to continue to accuse Newegg's website of infringement.

---

[4] The district court later additionally held, without explanation, that "SFA's statements regarding the salesperson refer to the disclosure and not to the asserted claims." A0014. But SFA's briefs expressly make the cited statements as part of its argument that "Filepp does not disclose the *limitation* a 'sales system used to facilitate a sales process.'" A3443.

Had the district court correctly read SFA's claims as requiring use by a salesperson to assist the salesperson in a real-world sales process, Newegg would undoubtedly have prevailed in proving non-infringement.

2.    *SFA's Claims Are Facially Invalid for Indefiniteness*

Claims in SFA's patents are invalid on their face for including method steps within system claims.    The claims require the actual performance of various actions by the system. '525 Patent, Claim 1 ("A computer implemented sales system . . . comprising . . . an event manager . . . *detecting* . . . *inferring* . . . and automatically *initiating*"); '341 Patent, Claim 1 ("An automated sales system . . . comprising: a plurality of subsystems . . . and an event manager . . . the event manager *detecting* . . . and automatically *initiating* . . . wherein at least one of the plurality of subsystems *determines* . . . and *updates*"); '341 Patent, Claim 27 ("A computer implemented sales system . . . comprising: a plurality of subsystems . . . wherein at least one of the plurality of subsystems *determines* . . . and *updates*"). Such facially indefinite claims have routinely been held invalid by this Court.

In *IPXL Holdings*, the claim read: "*The system of claim 2* [including an input means] wherein the predicted transaction information comprises both a transaction type and transaction parameters associated with that transaction type, and *the user uses the input means* to either change the predicted transaction information or accept the displayed transaction type and transaction parameters."    430 F.3d at

1384 (emphasis and alteration in original). This Court explained that such inclusion of method steps within a system claim made it "unclear whether infringement . . . occurs when one creates a system that allows the user to change the predicted transaction information or accept the displayed transaction, or whether infringement occurs when the user actually uses the input means to change transaction information or uses the input means to accept a displayed transaction." *Id.* Because the claim "recites both a system and the method for using that system, it does not apprise a person of ordinary skill in the art of its scope, and it is invalid under section 112, paragraph 2." *Id.*

In *Rembrandt Data Techs., LP v. AOL, LLC*, the claim read: "*A data transmitting device* comprising: first buffer means . . . fractional encoding means . . . second buffer means . . . and *transmitting the trellis encoded frames*." 641 F.3d 1331, 1339 (Fed. Cir. 2011). This Court cited *IPXL Holdings* for the proposition that such mixing of product and method claims is impermissible, and immediately concluded with no further analysis that "[a]pplying this doctrine, the district court correctly held [the claims at issue] invalid for indefiniteness." *Id. Rembrandt* went on to explain that courts could not fix the patentee's invalid choice of claim language: "[w]e have stated that this court . . . repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity." *Id.* at 1339-40 (citing *Chef Am., Inc. v. Lamb-Weston, Inc.*,

358 F.3d 1371, 1374 (Fed. Cir. 2004) ("Even a nonsensical result does not require the court to redraft the claims of the [']290] patent.  Rather, where as here, claims are susceptible to only one reasonable interpretation and that interpretation results in a nonsensical construction of the claim as a whole, the claim must be invalidated.  . . . [W]e must construe the claims based on the patentee's version of the claim as he himself drafted it.")).

In *Katz Interactive Call Processing Patent Litig. v. Am. Airlines, Inc.*, the claims read: "*An interface control system* . . . comprising: *interface means* for providing automated voice messages . . . to certain of said individual callers, wherein said certain of said individual callers *digitally enter data*."  639 F.3d 1303, 1318 (Fed. Cir. 2011).  This Court held that these "claims . . . create confusion as to when direct infringement occurs because they are directed both to systems and to actions performed by 'individual callers.' Katz's claims therefore fall squarely within the rationale of *IPXL* and are indefinite." *Id.*

The method steps of "detecting," "inferring," "initiating," "determin[ing]," and "updat[ing]" in Claim 1 of the '525 Patent and Claims 1 and 27 of the '341 Patent all likewise specify actions to be taken by the system, and thereby render these claims indefinite as a matter of law.  *IPXL Holdings*, *Rembrandt Data*, and *Katz* do not permit any other result.

This is not a situation where the "detecting," "inferring," "initiating," "determin[ing]," and "updat[ing]" steps are merely recited as system capabilities or configurations, as the district court concluded.  *Katz* rejected a similar argument, explaining that the presence of unqualified action verbs ends the inquiry: "[l]ike the language used in the claim at issue in *IPXL* ('wherein . . . the user uses'), the language used in Katz's claims ('wherein . . . callers digitally enter data' and 'wherein . . . callers provide . . . data') is directed to *user actions, not system capabilities*."  *Katz*, 639 F.3d at 1318.  Indeed, other terms within claims 1 of the '525 patent and 1 and 27 of the '341 patent are expressly recited as mere capabilities as opposed to actions.  *See* '525 patent, Claim 1 ("a plurality of subsystems of a computer *configured to* facilitate one or more actions"); '341 patent, Claim 1 ("a plurality of subsystems of a computer *configured to* electronically facilitate one or more actions"); '341 patent, Claim 27 ("a plurality of subsystems *configured to* electronically facilitate actions performed during the sales process").[5]  But the "detecting," "initiating," "inferring," "determin[ing]," and "updat[ing]" steps are recited without any such "configured to" language, and are clearly actual actions to be taken by the system.  *Cf. Comark Comm'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) ("There is presumed to be a

---

[5] Notably, asserted claim 40 of the '525 Patent includes only "configured to" language and therefore was not included in Newegg's summary judgment motion.

41

difference in meaning and scope when different words or phrases are used in separate claims.").

The fact that the "determin[ing]" and "updat[ing]" steps in Claims 1 and 27 are each found in a "wherein" clause in no way renders the "determin[ing]" and "updat[ing]" steps mere functional capabilities instead of recited actions. *Katz* rejected this exact argument: "Katz seeks to distinguish *IPXL* on the ground that the term 'wherein' does not signify a method step but instead defines a functional capability. We disagree and uphold the district court's ruling."  639 F.3d at 1318. The action verbs in Claim 1 of the '525 Patent and Claims 1 and 27 of the '341 Patent are meant to refer to actions taken by the claimed systems.

This is also not a situation like in *HTC Corp. v. IPCom GmbH & Co., KG*, where "[t]he claims merely establish those functions as the underlying network environment in which the mobile station operates."  667 F.3d 1270, 1277 (Fed. Cir. 2012).  In *HTC*, the claim covered "[a] mobile station for use with a network" and recited method steps that were performed by the network, not the claimed mobile station. *Id.* at 1274-1275 ("The plain language of claims 1 and 18 indicates that the network, not the mobile station, performs the enumerated functions.").  This Court explained:"[i]f the mobile station implements the functions, the claims are indefinite because they recite both an apparatus—the mobile station—and method steps—the functions enumerated in paragraphs 2-7.  If the network performs the

functions, the claims are not indefinite because the claims merely describe the network environment in which the mobile station must be used."  *Id.* at 1274. Because the network performed the functions, the claims were not indefinite.  *Id.* at 1278.

Here, in contrast with *HTC*, the "detecting," "inferring," "initiating," "determin[ing]," and "updat[ing]" steps recited above are all expressly performed by parts of the claimed sales system—i.e., the "event manager" or a "subsystem"— not by unclaimed external system components for use in connection with the sales system. *See* '525 Patent, Claim 1 ("*an event manager . . . detecting . . . inferring . . . and automatically initiating*"); '341 Patent, Claim 1 ("a plurality of subsystems . . . and an event manager . . . *the event manager detecting . . .* wherein *at least one of the plurality of subsystems determines . . . and updates*"); '341 Patent, Claim 27 ("a plurality of subsystems . . . wherein at least *one of the plurality of subsystems determines . . . and updates*").

The rule prohibiting the inclusion of method steps in system claims exists to preserve the meaningful delineations between classes of patentable subject matter under 35 U.S.C. § 101, which distinguishes between a "process, machine, manufacture, [and] composition of matter."  When a single claim is "a result of the combination of two separate statutory classes of invention, a manufacturer or seller of the claimed apparatus would not know from the claim whether it might also be

liable for contributory infringement because a buyer or user of the apparatus later performs the claimed method of using the apparatus." *IPXL*, 430 F.3d at 1384. Claims are required to "make clear whether infringement would occur when one creates a system that allows the user to change the predicted transaction information or accept the displayed transaction, or whether infringement occurs when the user actually uses the input means to change transaction information or uses the input means to accept a displayed transaction." *HTC*, 667 F.3d at 1277. Claim 1 of the '525 Patent and Claims 1 and 27 of the '341 Patent violate this rule and prevent the public from receiving fair notice of what constitutes infringement.

The district court's decision is squarely contradicted by *IPXL* and its progeny.  In direct contravention of *Rembrandt*, the district court engaged in impermissible "claim saving" when it "redraft[ed] claims . . . to make them operable or to sustain their validity." 641 F.3d at 1339-40.  SFA's claims are invalid for indefiniteness as a matter of law.

B.    SFA Filed and Maintained this Lawsuit in Bad Faith

SFA's business model is to file lawsuits and settle quickly for a small fraction of the cost of defense, to avoid ever having to test the merits of its cases in court.  When faced with a determined defendant set on vindicating its defenses, after pressing on for nearly four years, SFA cut and ran on the eve of expert disclosures.  SFA professed "business reasons" and a desire to focus on the

CONFIDENTIAL MATERIAL OMITTED

Amazon Litigation as the bases for suddenly dismissing Newegg from the case. But the circumstances surrounding the dismissal reveal that SFA was actually motivated by the realization that Newegg would not settle, and the fear that Newegg would force SFA to take a firm position on the merits and proceed to put its patents in jeopardy.

### 1.   *SFA Brought this Case for the Improper Purpose of Obtaining Nuisance-Value Settlements*

The record shows that SFA's settlement agreements are all for nuisance value.  Most of SFA's settlements from its litigation targets averaged around [[          ]], but often for [[          ]] or less.  A3733 (SFA financial transaction detail summary).

As this Court has observed, "low settlement offers . . . effectively ensure[] that [the patentee's] baseless infringement allegations remained unexposed, allowing [the patentee] to continue to collect additional nuisance value settlements." *Eon-Net LP v. Flagstar Bancorp,* 653 F.3d 1314, 1327 (Fed. Cir. 2011).  SFA's settlement amounts are very low compared with the cost of defense, revealing that SFA's desire is to obtain settlement revenue rather than pursue its targeted defendants in litigation.  Fees have been awarded under § 285 where, as here, it has been shown that "plaintiffs' litigation tactics were in bad faith to force defendants into settlement and away from their legitimate defenses." *Am. Standard, Inc. v. York Int'l Corp.*, 244 F. Supp. 2d 990, 997 (W.D. Wis. 2002).  Fees have also been awarded where a

plaintiff filed suit "without any basis for infringement" and strung the case along while it "extracted settlements from co-defendants worth a fraction of what it would actually cost them to defend the lawsuit, and then voluntarily dismissed its claims with prejudice prior to the court issuing a ruling on the merits." *Summit Data Sys. v. Emc Corp.*, No. 10-749-GMS, 2014 U.S. Dist. LEXIS 138248, at *8-14 (D. Del. Sep. 25, 2014) (finding case exceptional and ordering Acacia subsidiary Summit Data Systems to pay $1.4 million in fees to NetApp, where Summit Data Systems sued NetApp shortly after executing a license agreement that admittedly extinguished any possible infringement by NetApp, but failed to disclose the existence of the agreement to NetApp for 18 months of litigation); *see also Artese v. Academy Collection Service,* No. 3:96-cv-2546-GLG, 2000 U.S. Dist. LEXIS 1186, at *10-11 (D. Conn. Jan. 18, 2000) (explaining that the filing of many lawsuits seeking relatively small settlements "gives rise to a suspicion of *barratry and champerty*.").

An "overall vexatious litigation strategy" that is wasteful of judicial resources can also support an exceptional case finding, and belated timing of a dismissal can reveal bad faith and justify fee shifting.  *See Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.*, 726 F.3d 1359, 1367 (Fed. Cir. 2013).  In *Monolithic Power Systems*, for example, the case was deemed exceptional in large part because the plaintiff "withdrew its claims and granted covenants not to sue after substantial

litigation had taken place," "moving to dismiss only after [defendants] had completed their filings for the final pretrial conference, wasting the parties' and the court's resources." *Id.* Here, SFA waited nearly four years to dismiss Newegg, and did not actually dismiss Newegg until Newegg was on the verge of serving its expert reports, when Newegg was incurring considerable expense daily in attorney and expert fees. And SFA's motion to dismiss Newegg was filed literally the day after SFA prevailed on every claim construction issue and summary judgment motion pending, further showing that the dismissal had nothing to do with the merits of the case. SFA should not be rewarded for stringing this litigation along for four years, forcing Newegg to spend $1.2 million and counting to defend itself against this baseless case.

As further support that this case "stands out from others" under the fact-intensive case-by-case analysis of *Octane Fitness*, it is helpful to consider non-patent litigation circumstances where courts have found fee shifting justified. 134 S. Ct. at 1756. Courts have recognized that it is fundamentally unfair for a plaintiff to force a defendant to endure the burden and expense of litigation, see that no settlement payments are forthcoming, and just walk away. *See Colombrito v. Kelly*, 764 F.2d 122, 134-35 (2d Cir. 1985) (noting that awarding fees would be appropriate "if a litigant had made a practice of repeatedly bringing potentially meritorious claims and then dismissing them with prejudice after inflicting substantial litigation costs

on the opposing party and the judicial system"); *Upthegrove v. Health Prof'ls, LTD.*, No. 07-cv-0596-BBC, 2009 U.S. Dist. LEXIS 4546, at *12 (W.D. Wis. Jan. 21, 2009) ("Plaintiff cannot expect to subject defendant Rose to a year of litigation and walk away with no consequences."); *compare Monolithic Power Sys.*, 726 F.3d at 1367 (affirming award of fees, emphasizing that vexatious case was dismissed "after substantial litigation had taken place . . . wast[ed] the parties' and the court's resources").

Courts have also held that where the cost of defense greatly exceeds the cost of settlement, as it does here, plaintiffs can improperly use the leverage of pending litigation to coerce defendants into settling non-meritorious claims. *See, e.g., Ingenuity 13, LLC v. Doe*, No. 2:12-cv-8333-ODW, 2013 U.S. Dist. LEXIS 64564 (C.D. Cal. May 6, 2013). In *Ingenuity 13*, copyright plaintiffs were found to have acted in bad faith and sanctioned for fees in circumstances largely identical to those in this case. First, the plaintiffs engaged in a "nationwide strategy" to file lawsuits against many defendants. *Id.* at *6-7. Due to "the high cost of litigation," "[m]ost defendants settled . . . , resulting in proceeds of millions of dollars due to the numerosity of defendants." *Id.* "For defendants that refused to settle, the Principals engaged in vexatious litigation designed to coerce settlement. These lawsuits were filed using boilerplate complaints based on a modicum of evidence, calculated to maximize settlement profits by minimizing costs and effort." Finally, like SFA, in

48

*Ingenuity 13* "[t]he Principals have shown little desire to proceed in these lawsuits when faced with a determined defendant.  Instead of litigating, they dismiss the case." *Id.*

Bad-faith behavior like SFA's is frequently treated as exceptional and warrants shifting of attorneys' fees.  But here SFA also forced Newegg to incur about $275,000 in expert witness fees Newegg to rebut SFA's baseless case. A3737, A3748-52.  Using the court system to further SFA's extortive business practices is exactly the kind of egregious bad faith that warrants shifting of expert fees.  *MarcTec*, 664 F.3d 907 at 921; *Amsted Indus. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 378 (Fed. Cir. 1994) (explaining that "abuse of the judicial process" justifies shifting expert fees).

### 2.     *Nuisance Litigation is Exceptional and Egregious*

It is no secret that nuisance litigation brought by patent assertion entities is now fairly common and has become its own lucrative industry.  *See, e.g.,* Colleen V. Chien, *Patent Trolls by the Numbers*, Santa Clara University Studies Research Paper No. 08-13, *available at* http://ssrn.com/abstract=2233041 (March 13, 2013) (explaining that patent assertion entities file the majority patent lawsuits in the U.S., primarily targeting non-technology companies).

It would be clear error, however, for the district court to conclude from this state of affairs that such litigation misconduct is not "exceptional" within the

meaning of Section 285. *Octane Fitness* explained that "an 'exceptional' case is simply one that stands out from others" regarding weak merits positions or litigation misconduct. 134 S. Ct. at 1756. But the Court certainly did not suggest, let alone hold, that courts should allow themselves to become desensitized to bad faith nuisance litigation just because it is commonplace. Such a conclusion contradicts the plain purpose of Section 285, as well as basic fairness and common sense.

Section 285 is supposed to be remedial—to correct for unfairness and injustice. *See Octane Fitness*, 134 S. Ct. at 1753, 1756 n.6; *see also Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1312-13 (Fed. Cir. 2013). Neither Congress nor the Supreme Court was so cynical as to assume that patent litigation ordinarily involves bad faith and misconduct. The obvious assumption and requirement of Section 285 is that patent litigation will be brought and conducted in good faith, and that a case is "exceptional" when it sufficiently deviates from this expectation. *Cf. Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d 943, 954 (Fed. Cir. 2010) ("[T]here is a presumption that an assertion of infringement of a duly granted patent is made in good faith.").

Using the court system to further SFA's extortive business practices is exactly the kind of egregious bad faith and abuse of the judiciary that warrants

expert fee shifting. *MarcTec*, 664 F.3d 907 at 921. Bad faith assertions of frivolous lawsuits unreasonably burden litigation targets and courts. Awarding expert fees is necessary where a plaintiff's vexatious misconduct forces a defendant to incur those expert fees unnecessarily, because they are not compensable under Section 285. *Id.* at 921-22 (affirming expert fees award because "Cordis was forced to incur expert witness expenses to rebut MarcTec's unreliable and irrelevant expert testimony," such that "MarcTec's vexatious conduct and bad faith increased the cost of litigation in ways that are not compensated under § 285"). Here, as in *MarcTec*, SFA's experts' testimony was fatally flawed and could not have, under the correct law, established infringement liability. While SFA could have walked away much earlier, it chose to do so only when expert deadlines were imminent, knowing that phase of patent litigation is tremendously expensive on a daily basis. SFA only proceeded into expert discovery to apply more pressure to Newegg for a nuisance settlement. Forcing Newegg to spend roughly $275,000 on experts to rebut SFA's experts' baseless allegations, on top of all the other expense inflicted by SFA, is a grave injustice that cannot be permitted. *Id.* at 921 (expert fees should be shifted where "the very temple of justice has been defiled").

Patent litigation is supposed to resolve legitimate disputes surrounding bona fide infringement allegations, not facilitate nuisance-value patent monetization

campaigns. *See Eon-Net,* 653 F.3d at 1328 ("[T]he appetite for licensing revenue cannot overpower a litigant's and its counsel's obligation to file cases reasonably based in law and fact and to litigate those cases in good faith."). This Court should take this opportunity to clarify that litigation brought for the purposes of extorting nuisance-value settlements is exceptional and will not be tolerated or immunized from fee-shifting simply because it is widespread. And to the extent a nuisance litigation campaign crosses into the expert discovery phase of a case, those expert expenses should not have to be borne by the defendants.

### 3.  *Nuisance Litigation Should be Strongly Discouraged*

Section 285 and *Octane Fitness* recognize that the specter of fee-shifting is intended to have a deterrent effect on bad faith litigation and misconduct. 134 S. Ct. at 1756 n.6 (reminding district courts of "the need in particular circumstances to advance considerations of compensation and deterrence"). That purpose would be frustrated if all one had to do to avoid any possible fee-shifting is dismiss its case before losing on the merits. SFA should not avoid the expensive and wasteful consequences of its extortion tactics simply because it dismissed Newegg from the case.

To be clear, a plaintiff's voluntary dismissal of a meritless case should be encouraged at the earliest juncture. But when a case is brought for improper reasons unrelated to the merits, as it was here, the incentive to dismiss must also

include an incentive to dismiss at a meaningful time—i.e., before substantial expense and burden is inflicted on the defendant. This Court should clarify that Section 285 provides those incentives, and that such plaintiffs who pursue such cases for too long before dismissing will be viewed as acting in bad faith and will be ordered to pay a defendant's attorneys' fees. Again, to the extent a nuisance litigation campaign crosses into the expert phase of a case, those expert fees and expenses should not have to be borne by the defendants.

Using the United States judiciary to leverage nuisance-value settlements also reflects selfish opportunism and unreasonably burdens the courts. *See Artese*, 2000 U.S. Dist. LEXIS 1186 at *10-11 ("[I]t is not merely the prejudice and costs to the opposing party but also the effect upon the judicial system of such litigation. When we consider the numerous other cases commenced by this plaintiff . . . there has been indeed a substantial burden on the judicial system."). Behavior that treats the judiciary as a pawn for nuisance-value settlement negotiations and makes courts waste considerable time and resources should be strongly discouraged.

By contrast, defendants like Newegg, who do not pay a patentee in a nuisance litigation simply to make a lawsuit go away, play an important role in the patent system. Such defendants insist that plaintiffs justify their positions and, when the plaintiffs cannot or will not do so, will vindicate their defenses in court. If not for defendants like Newegg, abusive nuisance litigants would never be

exposed because every case would settle (or be unilaterally dismissed by the plaintiffs) and conceal the misconduct. Section 285 should serve as a meaningful deterrent to patent abuses like those present in this case.

Absent a meaningful fee-shifting standard that makes fees reasonably attainable, defendants are more likely to simply settle nuisance litigations because the financial downsides of mounting a strong defense are overwhelming. If SFA's conduct is not deemed exceptional and egregious in this case, it will embolden nuisance litigants to continue their abusive conduct unchecked.

When the Supreme Court issued *Octane Fitness* and *Highmark* on the same day, notwithstanding the adoption of an abuse-of-discretion standard for appellate review in *Highmark*, the decisions collectively reflected a clear directive that fee shifting was supposed to be made easier to achieve, not harder. *See, e.g., Octane Fitness*, 134 S. Ct. at 1756 (characterizing *Brooks Furniture* as "inflexible"); *id.* at 1756-57 (misconduct to justify fee shifting need not be independently sanctionable); *id.* at 1758 (the burden of proof for exceptionality is merely a preponderance of the evidence, not clear and convincing). This Court has the power to police the district courts in their exercises of discretion, and the Supreme Court undoubtedly intended that it would ensure that Section 285 was administered in a fair and just manner. *See Highmark*, 134 S. Ct. at 1748 n. 2 ("The abuse-of-

discretion standard does not preclude an appellate court's correction of a district court's legal or factual error.").

Justice requires that there be consequences for plaintiffs who file and maintain baseless lawsuits for the purpose of extracting cost-of-defense settlements, then dismiss those cases when no settlement proceeds are forthcoming. Newegg should be awarded its fess from SFA.

## II.     AT A MINIMUM, THIS CASE MUST BE REMANDED BECAUSE THE DISTRICT COURT DID NOT CONSIDER THE TOTALITY OF THE CIRCUMSTANCES

The Supreme Court in *Octane Fitness* explained that, under 35 U.S.C. § 285, "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." 134 S. Ct. at 1756. In applying this standard, the Court held that "[d]istrict courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, *considering the totality of the circumstances*." *Id.* Consideration of the totality of the circumstances in every case is required to restore the proper "holistic, equitable approach" to Section 285. *Id.* at 1754. (noting that a totality-of-the-circumstances analysis was the prevailing standard for decades before *Brooks Furniture Manufacturing, Inc. v. Dutailier International, Inc.*, 393 F.3d 1378 (2005)8, imposed a more "rigid and mechanical

formulation" that the Court abrogated). Here, the district court did not consider the totality of the circumstances.

A.     <u>The District Court Ignored Most of the Evidence of SFA's Bad Faith</u>

To prove SFA's bad faith, Newegg's fee motion presented evidence and argument on multiple fronts, including SFA's licenses, the Amazon Litigation, Newegg's refusal to pay a nuisance settlement, and SFA's avoidance of expert disclosures. A3710-14. The district court's exceptional case analysis totaled less than two pages, one page of which merely summarized the parties' contentions without discussing any underlying evidence.

Newegg's arguments showing SFA's bad faith were collapsed by the district court into and rejected in a single sentence: "the fact that SFA has filed several lawsuits against numerous defendants is insufficient to render this case exceptional." A0004. This facially unobjectionable statement does not begin to analyze the many facts and circumstances presented by Newegg to show bad faith.

The district court's passing comparison of this case to the CSIRO cases, which ostensibly are similar only in that multiple defendants were sued, does not make up for its total failure to weigh the vast majority of the evidence and Newegg's arguments. The district court's suggestion that "infringement is widespread" in both the CSIRO and SFA cases finds no support in the record. A0004. SFA has never established infringement by even a single defendant, and

the evidence before the district court showed that SFA's licensees never admitted any infringement liability, but merely desired to settle the litigation. A5132-33, A5140-41, A5175. To the extent the district court cited to the CSIRO cases to suggest that this case does not "stand[] out from others," the district court made no meaningful factual comparison between the two cases. A0004.

This dearth of analysis flies in the face of *Octane Fitness*. The district court's opinion does not consider the totality of the circumstances, or even a majority of the circumstances. This failure to apply the law correctly is an abuse of discretion that requires reversal or, at a minimum, a remand for consideration of Newegg's motion under the proper legal standard. *Highmark*, 134 S. Ct. at 1748 n.1; *Kilopass*, 738 F.3d at 1317-18.

### B.    The District Court Refused to Consider Newegg's Arguments on the Merits of the Case

As part of its "totality of the circumstances" test, *Octane Fitness* explained that "equitable discretion should be exercised in light of the considerations we have identified." *Octane Fitness*, 134 S. Ct. at 1756. Those considerations include "the substantive strength of a party's litigating position (considering both the governing law and the facts of the case)." *Id.*

Here, the district court refused to even consider the strength of SFA's case because Newegg was dismissed from the lawsuit before a judgment on the merits. Citing to no authority, it announced that "[f]or a case dismissed before trial to be

57

designated exceptional, evidence of the frivolity of the claims must be reasonably clear without requiring a 'mini-trial' on the merits for attorneys' fees purposes." A0004-05.

This standard finds no support in *Octane Fitness*. First, there is no basis to draw a bright line and create a special standard for cases that are "dismissed before trial." *Octane Fitness* repeatedly emphasized the importance of discretion and flexibility, stating that "there is no precise rule or formula for making these determinations." 134 S. Ct. at 1756. The exceptionality determination cannot hinge so greatly on the mere timing of a dismissal. *See Octane Fitness*, 134 S. Ct. at 1756 ("District courts may determine whether a case is 'exceptional' *in the case-by-case exercise of their discretion*."); *Kilopass*, 738 F.3d at 1317 ("[T]rial courts retain broad discretion to make findings of exceptionality under § 285 *in a wide variety of circumstances*.").

Second, proof of "frivolity" is not required. *Octane Fitness* rejected any requirement that objective baselessness be proven to show exceptionality. *Octane Fitness*, 134 S. Ct. at 1757 (rejecting contention that "a district court must determine *both* that the litigation is objectively baseless *and* that the plaintiff brought it in subjective bad faith") (emphasis in original). *Octane Fitness* jettisoned the notion that one must follow a specific "bad faith and objective baselessness" path to establish exceptionality. Rather, "a case presenting *either*

58

subjective bad faith *or* exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Id.* This is why the Supreme Court held that district courts must examine "the substantive strength of a party's litigating position" when a fee motion challenges the merits. *Id.* at 1756.

Third, even if cases dismissed before trial were appropriately treated with a special rule or analytical framework, it cannot be a correct test to insist that "evidence of the frivolity of the claims must be reasonably clear without requiring a 'mini-trial' on the merits." Although it is not clear what a "mini-trial on the merits" would entail in the district court's view, it is impossible to evaluate "the substantive strength of a party's litigating position" without examining the merits in a meaningful way. The district court, with no analysis of Newegg's merit-based arguments, merely stated that Newegg did not carry its burden under the district court's "reasonably clear" standard. A0004-05. To be sure, "[a] request for attorney's fees should not result in a second major litigation," *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 609 (2001), but *Octane Fitness* requires a much more searching analysis than the district court's conclusory statements in this case. At a minimum, the district court must assess—or reassess in light of all the evidence of exceptionality—the litigation positions on the merits issues in the case to arrive at some qualitative measure of the strength of those positions.

While the district court's claim construction and summary judgment decisions are relevant, merely alluding to those past decisions is insufficient to comply with *Octane Fitness*. *Octane Fitness* requires consideration of the totality of the circumstances including the substantive strength of SFA's litigation positions, which is not the same inquiry as a claim construction or summary judgment determination, both of which are subject to different standards from the broad discretionary standard of Section 285. A factually or legally weak argument by SFA that nonetheless was adopted by the district court, which perhaps appears even weaker under a fresh totality-of-the-circumstances analysis, would weigh in favor of Newegg under *Octane Fitness* as proof of exceptionality.

Finally, the district court's test does not even permit consideration of the merits-related issues alongside evidence of bad faith and litigation misconduct to correctly weigh the totality of the circumstances. Rather, the merits issues are treated in a vacuum and the failure to meet the district court's "reasonably clear" threshold dooms a fee motion regardless of any other considerations: "*[f]or a case dismissed before trial to be designated exceptional*, evidence of the frivolity of the claims must be reasonably clear without requiring a 'mini-trial' on the merits." A0004.

The district court's announcement and application of this incorrect legal standard requires, at a minimum, a remand for consideration of Newegg's motion under the proper legal standard.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed, this case should be declared exceptional and egregious, and should be remanded for the district court to order the amount of attorneys' fees and expert fees owed to Newegg.  Alternatively, at a minimum, the judgment must be vacated and the case remanded for reconsideration under the correct legal standard for exceptionality.

Respectfully submitted,

Dated:  October 28, 2014    By:    /s/ Kent E. Baldauf, Jr.
Kent E. Baldauf, Jr.
Daniel H. Brean
THE WEBB LAW FIRM
One Gateway Center
420 Fort Duquesne Blvd.
Suite 1200
Pittsburgh, PA 15222
Telephone:  (412) 471-8815

Edward R. Reines
WEIL GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000

Richard G. Frenkel
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Telephone (650) 463-3080

*Counsel for Appellant Newegg Inc.*

## **ADDENDUM**

1.    Order dated July 7, 2014 denying Newegg's Motion for Attorneys' Fees (A0001 – A0006)

2.    Memorandum Opinion and Order dated April 11, 2013 construing claim terms and denying Newegg's Motion for Summary Judgment of Invalidity for Indefiniteness (A0007 – A0048)

3.    Order dated May 30, 2012 addressing Newegg's Rule 72 Objections and Motion for Reconsideration concerning claim constructions (A0049 – A0050)

4.    Memorandum Opinion and Order dated August 8, 2011 construing claim terms (A0051 – A0073)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **SFA SYSTEMS, LLC,** | § | |
| | § | |
| | § | **Case No. 6:09-CV-340** |
| **Plaintiff,** | § | **[Lead Case]** |
| | § | |
| **v.** | § | *Consolidated with* |
| | § | |
| **1-800-FLOWERS.COM, INC., et al.,** | § | **Case No. 6:11-cv-399** |
| | § | |
| **Defendants.** | § | |
| | § | |

## ORDER

Before the Court is Defendant Newegg, Inc.'s ("Newegg") Motion for Attorneys' Fees (Docket No. 461). Having considered the Motion and related briefing and for the reasons stated below, the Court hereby **DENIES** the Motion.

## BACKGROUND

SFA Systems, LLC ("SFA") filed this action alleging patent infringement against Newegg, along with several other Defendants, in August 2011. In April 2013, SFA moved to voluntarily dismiss its claims against Newegg under Federal Rule of Civil Procedure 41(a)(2), with each party to bear its own costs and fees. Docket No. 453. While Newegg did not object to the dismissal of this suit with prejudice, it did oppose paying its own costs and fees. Docket No. 455 at 1. The Court granted SFA's Motion in part, dismissing with prejudice all claims and counterclaims in this action, but also granted Newegg leave to file this Motion and a motion for its bill of costs. Docket No. 459. Newegg now seeks over $1.2 million in attorneys' fees under 35 U.S.C. § 285, 28 U.S.C. § 1927, and the Court's inherent power. Although all briefing on this Motion was filed prior to the Supreme Court's recent decision in *Octane Fitness, LLC v. Icon*

**A0001**

*Health & Fitness, Inc.*, 134 S. Ct. 1749, 1753 (2014), which rejected the prior Federal Circuit

legal test for determining whether a case is exceptional under 35 U.S.C. § 285, the parties did not

request leave for additional briefing and none was required to decide the Motion.

## APPLICABLE LAW

### Exceptional Case Under 35 U.S.C. § 285

"The court in exceptional cases may award reasonable attorney fees to the prevailing

party." 35 U.S.C. § 285. Prior to the Supreme Court's recent decision in *Octane Fitness*,

Federal Circuit precedent required the prevailing party to produce clear and convincing evidence

that the opposing party's claims were objectively baseless and brought with subjective bad faith

to declare a case exceptional. *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378,

1381–82 (Fed Cir. 2005). Rejecting both the clear and convincing evidence standard and the

two-part test, the Supreme Court held that an exceptional case under § 285 is "simply one that

stands out from others with respect to the substantive strength of a party's litigating position

(concerning both the governing law and the facts of the case) or the unreasonable manner in

which the case was litigated." *Octane Fitness*, 134 S. Ct. at 1756. Further, district courts "may

determine whether a case is 'exceptional' in the case-by-case exercise of their discretion,

considering the totality of the circumstances." *Id.* at 1757. As the Supreme Court noted, "a case

presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself

apart from mine-run cases to warrant a fee award." *Id.*

### 28 U.S.C. § 1927 and the Court's Inherent Power

"Any attorney . . . who so multiplies the proceedings in any case unreasonably and

vexatiously may be required by the court to satisfy personally the excess costs, expenses, and

attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Sanctions

2

under § 1927 require "clear and convincing evidence that *every facet* of the litigation was patently meritless" and "evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court." *Procter & Gamble Co. v. Amway Corp.*, 280 F.3d 519, 525–26 (5th Cir. 2002) (emphasis in original). These sanctions are designed to be punitive in nature and generally focus on the conduct of the litigation rather than the merits. *Bryant v. Military Dep't of Miss.*, 597 F.3d 678, 694 (5th Cir. 2010).

Similarly, courts retain an inherent power to impose sanctions for "bad faith conduct in litigation." *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001). The threshold to invoke the inherent power to sanction is high and is to be used only when a court finds that "fraud has been practiced upon it, or that the very temple of justice has been defiled." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991).

## ANALYSIS

Here, Newegg argues it should be awarded attorneys' fees because SFA engaged in vexatious litigation and brought objectively baseless claims against Newegg in bad faith. Docket No. 461 at 12. Newegg contends that SFA never intended to try this case on the merits, but filed this action solely to extract a settlement. *Id.* Newegg supports this claim by asserting that SFA has engaged in a pattern of repeatedly suing defendants, then settling for far less than the potential damages recovery. *Id.* In this case in particular, Newegg argues, SFA avoided ever taking a substantive position by offering strategically vague claim construction positions and dismissing its claims just before expert reports were due. *Id.* at 13–14. Additionally, Newegg contends SFA's claims are objectively baseless because the patents asserted here are both invalid, in light of prior art, and not infringed, because the patents are directed to real-world processes while the accused systems are exclusively online retail systems. *Id.*

3

SFA argues that it has not engaged in any misconduct in this case and that its claims against Newegg were neither objectively baseless nor brought in bad faith.  Docket No. 464 at 5–6.  To support its position, SFA cites that the Court rejected Newegg's proffered claim constructions and denied Newegg's motion for summary judgment of indefiniteness, indicating that SFA's patents may subject to a broader interpretation than Newegg claims and that material issues of fact existed here.  *Id.*  SFA also contends that its decision to dismiss its claims against Newegg was a business decision, made when SFA determined that risk and expense of trial outweighed the potential financial benefit of continuing this action.  *Id.* at 7.

Newegg's primary complaint is that SFA has filed many suits against many defendants, therefore engaging in a pattern of abusive and vexatious litigation to extract settlement.  Docket No. 461 at 1.  However, the fact that SFA has filed several lawsuits against numerous defendants is insufficient to render this case exceptional.  In many cases, patent infringement is widespread and the patent owner may be forced to revert to widespread litigation against several infringing parties to enforce its intellectual property rights.[1]

Even under the new, lower standard for an exceptional case designation, Newegg has provided no evidence that this case "stands out from others with respect to the substantive strength of [SFA's] litigating position."  *Octane Fitness*, 134 S. Ct. at 1756.  Newegg's attempt to limit the scope of the patent through claim construction was rejected when the Court declined to adopt any of Newegg's proposed constructions.  *See* Docket No. 452.  Further, Newegg's bare allegations that it would have prevailed on the merits are also insufficient to render this an exceptional case.  For a case dismissed before trial to be designated exceptional, evidence of the frivolity of the claims must be reasonably clear without requiring a "mini-trial" on the merits for

---

[1] For example, Commonwealth Scientific and Industrial Research Organisation has been involved in litigation before this Court since 2005, including 16 separate actions and infringement claims against over 36 separate parties.

attorneys' fees purposes. Newegg has failed to meet that burden. Having provided insufficient evidence that SFA's claims or conduct render this case exceptional, Newegg is not entitled to attorneys' fees under 35 U.S.C. § 285.

Newegg has also failed to demonstrate it should be awarded fees under 28 U.S.C. § 1927 or through the Court's inherent power to sanction. Section 1927 is directed to the actions of the attorneys involved in the case, not the parties. Newegg failed to allege any specific actions by SFA's counsel that rise to the level of bad faith, improper motive, or reckless disregard of the duty owed to the Court, as required to support sanctions under § 1927. Further, a case must be "sufficiently beyond 'exceptional' within the meaning of § 285 to justify . . . a sanction under the court's inherent power." *Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d 943, 966 (Fed. Cir. 2010) (quoting *Amsted Indus., Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 378–79 (Fed. Cir. 1994)). Since Newegg failed to show this case was exceptional under the new, lower standard—much less the more stringent exceptional test of *Brooks Furniture*—there is no justification to invoke the Court's inherent power to impose a sanction of attorneys' fees here.

Having failed to demonstrate that this is an exceptional case under 35 U.S.C. § 285 or that sanctions are warranted under 28 U.S.C. § 1927 or through the Court's inherent powers, Newegg's Motion is **DENIED**.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Newegg's Motion for Attorneys' Fees (Docket No. 461).

A0005

**So ORDERED and SIGNED this 7th day of July, 2014.**

_____
**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| SFA SYSTEMS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | **CASE NO. 6:09-cv-340-LED** |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| 1-800-Flowers.com, Inc., et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

| | | |
|---|---|---|
| SFA SYSTEMS, LLC, | § | |
| | § | |
| | § | |
| Plaintiff, | § | **CASE NO. 6:11-cv-052-LED** |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| Amazon.com, Inc., et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

This Memorandum Opinion construes U.S. Patent No. 6,067,525 (the "'525 Patent") and U.S. Patent No. 7,941,341 (the "'341 Patent"). Also before the Court are Defendants' Motions for Summary Judgment of Invalidity for Indefiniteness (Case No. 6:11cv52, Docket No. 338 and Case No. 6:09cv340, Docket No. 433). For the reasons discussed below, the Court **DENIES** Defendants' motions.

## BACKGROUND

The '525 Patent has a long history before the Court as Plaintiff SFA Systems, LLC ("SFA") has filed several separate suits against multiple defendants for infringement of the '525 Patent. The Court first construed the '525 Patent in a case against Infor Global Solutions, Inc.

and seven other defendants. *SFA Systems, LLC v. Infor Global Solutions (Michigan), Inc., et al.*, Case No. 6:07cv067, Docket No. 211 (hereinafter, "*Infor* opinion"). Since then, SFA has filed several more cases involving the same patent. *See SFA Systems, LLC v. BigMachines, Inc.,* Case No. 6:10cv300; *SFA Systems v. Rightnow Technologies, Inc.*, Case No. 6:11cv560; *SFA Systems v. Drugstore.com, Inc.*, Case No. 6:11cv635. The Court construed the '525 Patent a second time in *SFA Systems v. 1-800-Flowers.com, Inc*., Case No. 6:09cv340, Docket No. 333 (hereinafter, "first *1-800-Flowers* opinion").[1] Many of the disputed terms have been previously construed by the Court. As the Court has already repeatedly described the technology at issue in the '525 Patent, it will not do so again. *See, e.g.*, Case No. 6:07cv067, Docket No. 211.

In addition to the '525 Patent, the '341 Patent is before the Court for the first time. The '341 Patent is a direct descendent of the '525 Patent, and is also directed to a sales-force automation system that integrates intelligent, automated salesperson support for multiple phases of the sales process. '341 Patent, Abstract. Generally, the claims of the '341 Patent are directed to systems that detect changes in information relating to events in a sales system, automatically initiate an operation based on the event, determine whether the event has occurred previously and update other events if the operation is automatically initiated. *See id.* at 3:55–4:3. Although the Court has not previously construed the '341 Patent, the Court has construed several of the terms currently in dispute in previous litigation arising from related patents.

## APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys.*,

---

[1] The Court adopted the opinion of Magistrate Judge Love with a minor modification regarding the claim phrase "inferring . . . a context." Case No. 6:09cv340, Docket No. 406.

A0008

*Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id*. Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim

3

or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*. Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id*. Generally, extrinsic

A0010

evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

## ANALYSIS

**"sales process"**

This term appears in Claims 1, 2, 3, 13, 20, 21, 24, 25, 40, and 42 of the '525 Patent and Claims 1, 2, 13, 14, 16, 27, 29, 31, 32, and 33 of the '341 Patent. Plaintiff proposes "a process of selling goods or services, including two or more phases such as lead generation, time with customer, order management, and customer retention," as construed in the first *1-800-Flowers* opinion. Case No. 6:09cv340, Docket No. 333 at 8. The Defendants in the *Amazon.com, Inc.* case ("Amazon Defendants") propose "a real world process of selling goods or services including two or more phases such as lead generation, time with customer, order management and customer retention." Newegg, Inc. ("Newegg"), the sole defendant in the *1-800-flowers.com, Inc.* case, proposes "a real life process of a salesperson selling goods or services, including two or more phases such as lead generation, time with customer, order management, and customer retention." The parties' primary dispute is whether the definition of "sales process" should include Defendants' proposed real-world process and salesperson elements.

SFA argues the term is presumed to have the same meaning in both the '525 and '341 Patents because they share a common specification. Case No. 6:11cv52, Docket No. 335 at 8. Further, SFA contends Defendants' request to import "real-world process or salesperson" into the previous construction is unnecessary because the parties have already stipulated that "event occurring in the sales process" is a real-life action. *Id*. at 9.

To justify adding "real-world process" to the construction, the Amazon Defendants point to the Court's prior determination that an "event occurring in the sales process" is "a real-life

A0011

action or inaction that occurs in the sales process." Case No. 6:11cv52, Docket No. 339 at 5–6. These Defendants contend that SFA opposes defining the sales process as a real-world activity in order to pursue infringement theories against Defendants' websites that lack a real-world element. *Id.*

For its part, Newegg offers several theories to support including "salesperson" and "real life" as a clarification of the previously construed definition. Case No. 6:09cv340, Docket No. 340 at 5–12. First, Newegg contends that when the term "sales process" appears in the claims, it expressly relates to a process involving a salesperson. *Id.* at 5. Second, Newegg argues that the title of the '341 Patent is "Sales Force Automation System and Method" and *sales force* is defined as a group of employees whose job it is to sell their company's products or services. *Id.* at 6. Third, Newegg contends that the patent's prosecution history also supports inclusion of a salesperson, since the applicants repeatedly argued in amendments that the invention "improves the efficiency with which a salesperson completes sales transactions." *Id.* at 7. Fourth, Newegg maintains that the kiosk and website implementations in fact are only examples of tools that can form part of the sales process by collecting information for use by a salesperson. *Id.* at 8. Finally, Newegg points to SFA's arguments in prior litigation related to the '525 Patent. *Id.* at 10. In response to a motion for summary judgment of invalidity, SFA argued the '525 Patent's purpose was to help salespersons, thus distinguishing it from prior art that was *not* directed at helping salespersons. *Id.* In the first *1-800-Flowers* opinion, the Court concluded that SFA did not argue that the claims "*only* cover salesperson interaction," but Newegg believes that SFA did in fact distinguish prior art solely based on the presence of a salesperson. *Id.* at 11. Even if there are other distinguishable factors, Newegg contends that because SFA expressly relied on the presence of a salesperson to defeat an invalidity challenge to its patent, those arguments have a

A0012

disclaimer effect such that SFA should be estopped from arguing that a salesperson is not necessary. *Id*. at 11–12.

The Court has already construed this term, and "[t]he same terms in the same patent or related patents are presumed to carry the same meaning." *DataTreasury Corp. v. Magtek, Inc*., 2006 U.S. Dist. LEXIS 100662, at *10–11 (E.D. Tex. Sept. 29, 2006) (citing *Omega Eng'g, Inc. v. Raytek Corp*., 334 F.3d 1314, 1334 (Fed. Cir. 2003)). The Court will not add Defendants' proposed real-world or real-life requirements to the construction. While discussing the distinction between "events occurring in the system" and "events occurring in the sales process" in its prior opinion, the Court previously stated:

> The invention is intended to integrate *a real-life sales process* with events occurring in a computerized system. *See* '525 patent, Abstract ("A salesforce automation system which integrates computerized, intelligent automated salesperson support for multiple phases of the sales process."). Events occurring within the *system* are distinct from events occurring in the *sales process* because *the system is "computerized" and the "sales process" is real-world activity*. *Id*. at 30:36–41 ("a sales event may be an event in the sales process, typically occurring between the salesperson and the customer, while an application event may be an internal operation of the sales system (i.e., the operation of the software and hardware making up the sales system) which is used to electronically facilitate the sales event").

First *1-800-Flowers* opinion, at p. 7–8 (emphasis added). Thus, in order to appropriately distinguish "events . . . in the sales process" from "events . . . in the system," the Court has already stated that the sales process is real-world activity. First *1-800-Flowers* opinion, at 8. The Court did not, however, hold that the meaning of "the sales process" unequivocally excludes computer activity, as Defendants' proposals suggest. Such a finding is inconsistent with the teachings of the specification. For example, Figures 21 A through E list exemplary events, most of which either expressly or implicitly involve both real-world activity and the use of the computing system. *See* Figures 21 A and B ("a customer contacts an Internet Web-site to get product information"; "a customer uses a kiosk to gain information on a product or service and

A0013

request follow-up call from company representative"; "Salesperson configures a product and service solution for a customer"). Finally, the Amazon Defendants' complaint—that SFA's infringement contentions against e-commerce websites with no real-world element contradict the previous construction—does not warrant fresh claim construction. Instead, such complaints are appropriately addressed in motions for summary judgment.

Newegg's proposed "salesperson" requirement is not appropriate, either. Absent express claim language, the claims do not require use by a salesperson to the exclusion of other potential embodiments. First *1-800-Flowers* opinion, at 13. The Court has already determined that SFA did not argue previously that the claims only cover salesperson interaction. *Id.* at 14. In the prior litigation, SFA addressed the Filepp art by arguing that "[the system] could possibly be programmed for many purposes." Ex. F to Response, *Infor Litigation*, Pl.'s Resp. Mot. Summ. J. Inv. at 4. SFA went on to point out that Filepp does not "describe how to program the Prodigy online subscription service for direct sales from salespersons to end–user customers." *Id.* However, SFA stopped short of stating the asserted *claims* require a sales person, indicating that SFA's statements regarding the salesperson refer to the disclosure and not to the asserted claims. This conclusion seems obvious considering that SFA's argument distinguishing Filepp would have been much stronger had they simply argued that the claims require a salesperson. In sum, neither the claims themselves nor the intrinsic record support such a limitation. Therefore, SFA is not estopped from arguing that a salesperson is not a necessary part of the claimed sales process and there is no reason to import such limitation into the construction.

"Sales process" is construed—consistent with the Court's previous construction—as "a process of selling goods or services, including two or more phases such as lead generation, time with customer, order management, and customer retention."

A0014

**"facilitate/facilitating/facilitate a sales process"**

These terms appear in Claims 1 and 40 of the '525 Patent and Claim 27 of the '341 Patent. SFA contends no construction is necessary. The Amazon Defendants propose "assist" and "assisting" in place of "facilitate" and "facilitating."[2] Thus, the dispute is whether the construction should replace the common claim word, "facilitate," with another common word and arguable synonym, "assist."

The Amazon Defendants contend their construction is correct because the Court previously described the sales process as a "real-life . . . process," and the specification repeatedly uses the word "assist" to describe the manner in which the claimed sales system assists humans through the various states of that process. Case No. 6:11cv52, Docket No. 339 at 8. Therefore, "assist" distinguishes between the computerized process and the real-life process. *Id*.

SFA argues that Defendants' construction is simply a back-door attempt to imply that salesperson action is a requirement of these claims, and thus improperly imports a limitation from the specification. Case No. 6:11cv52, Docket No. 335 at 8.

These terms need no construction. First, the meaning of "facilitate" is clear in the context of the claim and it will be readily understandable to the jury. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co*., 521 F.3d 1351, 1362 (Fed. Cir. 2008) (recognizing that "district courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims"). The parties present no legally sound reason to replace the claim word, "facilitate," with the specification word, "assist."  There is no reason to import claim limitations that are not required by the claim language or the intrinsic record. Second, the Court has already clarified

---

[2] For example, "facilitate a sale," "facilitate a sales process," and "facilitate a new action." Case No. 6:11cv52, Docket No. 339 at 7–10.

A0015

that the sales process is a real-life activity but that it does not exclude computer involvement. *See supra* at 8 (citing first *1-800-Flowers* opinion, at 8). Thus, there is no need to further belabor the claim construction to highlight this distinction.

**"[facilitate a] new action"**

This term appears in Claims 1, 13, 31, 32 of the '341 Patent and Claims 1 and 20 of the '525 Patent. SFA contends no construction is necessary. The Amazon Defendants contend "facilitate a new action" should be construed as "to assist with a new action in the sales process," As "facilitate" has already been addressed, this dispute boils down to whether "new action" refers to an event *in the sales process.*

SFA argues that the term "new action" is used ordinarily in the context of the claims, and that Defendants' addition of "in the sales process" improperly imports a term from the specification to introduce a novel limitation wholly absent from the original term. Case No. 6:11cv52, Docket No. 335 at 10–11.

The Amazon Defendants argue that the term "new action" refers to an event in the real-life sales process because the claims consistently use "facilitate" for this type of real-life event. Case No. 6:11cv52, Docket No. 339 at 10. The Amazon Defendants further reason that the patents consistently use "act" or "action" to refer to that real-life sales process. *Id.* In other places, the claims describe certain events as occurring within the *computer* system, whereas this "new action" lacks such a description. *Id.* Therefore, the Amazon Defendants reason that this new action must occur outside the computer system, as part of the real-world sales process. *Id.*

It is not necessary to include "sales process" in the construction of "new action." It is clear from the claims that the new action is part of the sales process. *See Phillips*, 415 F.3d at 1314 ("[T]he claims themselves provide substantial guidance as to the meaning of particular

A0016

claim terms"). Each of the disputed claims follows the same pattern. It starts with a computer designed to facilitate sales-process actions. Then, later in the claim, a "new action" appears:

> a plurality of subsystems of a computer configured to electronically ***facilitate one or more actions*** performed during at least one phase of ***the sales process***;
>
> . . .
>
> [an] event manager detecting one or more changes in information regarding an event occurring within the system and automatically initiating an operation in one or more particular subsystems of the computer to ***facilitate a new action*** based on the event

'341 Patent, 39:1–10 (emphasis added). *See also* 40:22, 33; 42:27, 42; 42:54, 65; '525 Patent, Claims 35:65–66, 36:8–9; 37:35–36, 44–45 (same). In each claim at issue, the term "new action" refers to the earlier "one or more actions . . . [in] the sales process." Logically, these "new actions" are just as much a part of the sales process as the predicate actions mentioned earlier in each claim. "New action" needs no further construction. However, the parties are cautioned to read this resolution of the dispute consistent with the previous holding that the sales process does not exclude computer activity, as explained above.

**"a computer implemented sales system"/"automated sales system"**

This term appears in the preambles of Claims 1, 27, 31, 33 of the '341 Patent and Claims 1 and 40 of the '525 Patent. The Court addressed this term in its first opinion in the *1-800-Flowers* case and determined it did not require construction. First *1-800-Flowers* opinion, at 11–13. SFA asserts that no construction is necessary for this term or that, if construed, it should be given its plain and ordinary meaning. Newegg proposes a "computer system used to guide a salesperson or guide content to a salesperson automatically during multiple phases of a sales process." As with the construction of "sales process," the dispute revolves around whether this term should be construed so as to incorporate a salesperson.

A0017

SFA contends that because the term is clear on its face, the construction should not incorporate a salesperson. Case No. 6:09cv340, Docket No. 425 at 5–6. SFA also argues that the Court previously rejected the proposal to incorporate a salesperson because the specification does not describe using the claimed systems and methods to assist a salesperson to the exclusion of other potential embodiments. *Id*.

Newegg argues that its proposed construction reflects the proper essence of the invention, which is designed to help a salesperson make sales. Case No. 6:09cv340, Docket No. 430 at 12–13. Newegg argues that the inventor used the salesperson to distinguish the invention from prior art during prosecution and in prior litigation. *Id*. Therefore, Newegg contends that an appropriate construction is one that makes clear that the system is intended to assist a salesperson. *Id*.

While the specification does describe using the claimed systems and methods to assist a salesperson, it does not do so to the exclusion of other potential embodiments. First *1-800-Flowers* opinion, at 12–13. Further, the Court will not import a salesman limitation where a salesperson is not literally required by the claims. "[A] computer implemented sales system"/"automated sales system" does not require construction.

**"event manager"**

This term appears in Claims 1, 27, 28, 29, 30, 31, and 33 of the '341 Patent and Claims 1, 40, 41, 42, and 43 of the '525 Patent. The Court has twice previously reviewed this term as it appears in the '525 Patent, first in the *Infor* opinion and again in the first *1-800-Flowers* opinion. Case No. 6:07cv067, Docket No. 211 at 8–9; Case No. 6:09cv340, Docket No. 333 at 22. The original construction was "hardware and/or software." *Infor* at 9. Later, in response to a dispute as to whether the event manager is structural, the Court amended the construction to "hardware and or software that is within a computer implemented sales system." First *1-800-Flowers*

A0018

opinion, at 22. SFA proposes the construction adopted in the first *1-800-Flowers* opinion. Defendant Newegg proposes "an inference engine that is functionally separate from the subsystems." The disputes are whether: (1) the absence of the '525 Patent's "inference" claim limitations from the '341 Patent necessitates a more detailed definition to include an "inference engine;" and (2) the event manager must be functionally separate.

## 1) Inference Requirement

Newegg argues that "event manager" must be clarified because Claims 1 and 40 of the '525 Patent recite "an event manager . . . inferring occurrence of the event . . . , " while Claims 1 and 27 of the '341 Patent do not recite any inference capability. Case No. 6:09cv340, Docket No. 430 at 19. Newegg suggests that the Court referred to this inference capability in its previous determination that additional claim limitations on the event manager in the '525 Patent prevent it from reading on "anything under the sun." *Id.* at 20. According to Newegg, the prosecution history also suggests that the inference capability is central to the '525 Patent. *Id.* Thus, Newegg argues that the previous construction, absent an inference limitation, would allow the event manager to read on "anything under the sun." *Id.*

SFA asks for adoption of the previous construction to be consistent. Case No. 6:09cv340, Docket No. 425 at 9. SFA maintains that there is no further need for clarification and it is improper to import a specific embodiment into this claim term. *Id.*

The construction in the first *1-800-Flowers* opinion is appropriate. The term's construction was based on the '525 Patent's specification, which remains unchanged, and is substantively identical to the '341 Patent's specification. The inference engine discussed by the patents is described as an option for "an alternative embodiment" employing an expert system. *See* '341 Patent, Col. 36–37. The effect of Newegg's request is to limit the subject claims to this

13

alternative embodiment. Furthermore, each independent claim at issue provides multiple functional limitations to the "event manager," thus preventing an overly broad reading of the term. Therefore, the event manager cannot read anything under the sun.

### 2) Functionally Separate Requirement

Newegg further proposes "an inference engine that is *functionally separate* from the subsystems" because the event manager is always described and shown as being functionally separated from the subsystems. *Id.* at 22–23. Newegg argues that since the event manager is the brain of the claimed system, it must be separate from the various subsystems in order to interface with them. *Id.*

SFA contends Newegg's proposed "functionally separate" language does not correspond to any part of the term being construed. Case No. 6:09cv340, Docket No. 425 at 9. Therefore, SFA argues that adding this language to the construction would improperly create new limitations. *Id.*

Adding "functionally separate from the subsystems" to the construction would muddy the term instead of clarifying it. The claims recite an event manager "coupled to the subsystems and configured to" realize various operations within them. '341 Patent, Col. 50–65. While in one sense the event manager has a distinct function from that of each subsystem, at the same time the event manager works in conjunction with each system to realize any given function. For example, Figure 5 of the '525 Patent shows the event manager working with the order management component. '525 Patent, 3:3–4. The claims set out the functionality of the event manager with sufficient specificity such that adding additional limitations to the construction is unnecessary.

In sum, the parties have not proposed any meritorious clarification for "event manager"

**A0020**

and there is no reason to read additional limitations into this term. Consistent with its prior construction, "event manager" is construed as "hardware and/or software that is within a computer implemented sales system."

**"detecting one or more changes in information regarding an event"**

This term appears in Claims 1 (event in the system), 13 (event in the sales process), 27 (event in the system), and 32 (event in the sales process) of the '341 Patent. SFA suggests that no construction is needed. Newegg proposes "detecting one or more changes in information concerning an event *that exists in the system*." The dispute centers around whether the detected changes in events are limited to *pre-existing* events.

SFA offers several reasons for leaving this term unconstrued. First, SFA submits that commonly understood words like "detect" and "information" need not be defined, and there is no indication of a special meaning in the context of the claims. Case No. 6:09cv340, Docket No. 425 at 9. SFA also contends that to the extent "event" has a special meaning, it has already been construed in the '525 patent in the context of "event occurring in the system" and "event occurring in the sales process."[3] *Id.* at 10. Further, since the claims alternatively use the term "event" to refer to events occurring in the system (e.g., Claims 1 & 27) and events occurring in the sales process (e.g., Claims 13 and 32), limiting all claimed events to system events would contradict the express claim language. *Id.*

Newegg argues that the specification illustrates that when changes in information regarding an event occurs in the system, that information already existed in the system. Case No. 6:09cv340, Docket No. 430 at 26. For example, Newegg points to portions of the specification

---

[3] The previous construction of "event occurring in the system" was "an operation of the software or hardware making up the sales system." First *1-800-Flowers* opinion, at 7. The previous construction of "event occurring in the sales process" was "a real-life action or inaction that occurs in the sale process." *Id.* at 10.

A0021

that recite an automatic checking of changes made to information in the system, and reasons that such information necessarily already existed in the system. *Id.* at 26.

The plain language of the claims includes information regarding new events and pre-existing events. The claims recite "changes in information regarding *an* event." The specification, which discusses the occurrence of events and the subsequent action of the system, does not contradict the claim language. Contrary to the plain claim language and the specification's teachings, Newegg's proposal would limit the claim so that new events could not satisfy this limitation. In addition, Newegg's proposal requires that all events "exist[] *in the system.*" As noted above, each of the subject claims expressly requires either events occurring in the system or events occurring in the sales process. Thus, Newegg's proposal would be either duplicative of Claims 1 and 27 or contradictory to the express claim language of Claims 13 and 32. This term needs no construction.

### "event occurring within/in the system"

This term appears in Claims 1 and 27 of the '341 Patent. SFA proposes adoption of the Court's prior construction, "an operation of the software or hardware making up the sales system." First *1-800-Flowers* opinion, at 7. Defendant Newegg proposes "an internal software or hardware activity that corresponds to an event in the sales process." The disputes include whether the system events: (1) must be internal; and (2) necessarily correspond to events in the sales process.

SFA argues the Court's previous construction is proper, whereas Newegg's proposed construction would introduce an additional limitation not contemplated by the claims. Case No. 6:09cv340, Docket No. 425 at 13. Despite the fact that the Court previously distinguished an "event occurring within/in the system" from an "event occurring in the sales process," Newegg's

A0022

proposed construction makes "event occurring within the sales process" a requirement of an "event occurring within the system." *Id.*

Newegg points to the specification to support its arguments that the software or hardware activity must be internal. Case No. 6:09cv340, Docket No. 430 at 27–28 ("a sales event may be an event in the sales process, . . . while an application event may be an internal operation of the sales system . . . ."). Newegg also contends that, according to the specification, application events "generally represent a sales event occurring in the sales process." *Id.*

The Court has already construed an "event occurring within the system" as "an operation of the software or hardware making up the sales system." Although the specification does mention the word "internal," the Court's construction contemplates that word by referring to "hardware or software making up the sales system." Newegg's proposal confuses rather than aids the Court's construction by raising the question of what is "internal" hardware or software. Further, it is not necessary to define the system event as one "that corresponds to an event in the sales process" because any correspondence between events in the sales process and events in the system is already expressly required by the claims. For example, Claim 1 recites a subsystem that "determines if the event has occurred previously in the sales process and updates another event or task in at least another subsystem. . . ." '341 Patent, 39:11–14. While consistent with many embodiments, Newegg's proposal would require both types of events in every claim, thereby improperly importing limitations. Therefore, consistent with the Court's previous construction, "event occurring within/in the system" is construed as "an operation of the software or hardware making up the sales system."

**"the event has occurred previously in the sales process"**

This term appears in Claims 1, 13, 27, 31, 32, and 33 of the '341 Patent. SFA contends that the term does not require additional construction beyond the previous constructions of "event" and "sales process." The Amazon Defendants propose "the event has occurred previously in the same sales process in which an item or service is sold." Newegg proposes "determines if the event is at least the second occurrence of the event in the same sales process that pertains to the customer associated with the event." The dispute is whether construction is necessary to define *which* event and sales process are referenced by "the event" and "the sales process."

SFA contends that no construction is necessary because "event" and "sales process" have already been construed, and "occurred previously" does not acquire any special meaning here that would require construction. Case No. 6:09cv340, Docket No. 425 at 11. Furthermore, mentions of *the* event and *the* sales event clearly refer back to the event or sales process mentioned earlier in the claim. *Id.* at 12. SFA states that any confusion about this antecedent basis can be resolved by jury instructions rather than through a claim construction that creates new limitations. *Id.* at 12.

The Amazon Defendants contend that the event and sales process in this term refer to the *same* event and sales process, respectively, mentioned earlier in each claim. Case No. 6:11cv52, Docket No. 339 at 15. By example, Claim 13 recites "detecting one or more changes in information regarding *an* event occurring in *the sales process*" and later "determin[ing] if *the* event has occurred previously in *the sales process*." *Id.* Therefore, the latter phrase refers back to the same event mentioned earlier and refers to the same sales process. *Id.*

Similarly, Newegg argues that without construction, the term "occurred previously" could apply to any previous event in any sales process ever completed, without any meaningful boundaries. Case No. 6:09cv340, Docket No. 430 at 23. Therefore, Newegg seeks to construe the term to clarify that "the event" refers to a prior event that occurred in the present sales process. *Id*. at 24. Moreover, a given sales process necessarily relates to a specific customer, with steps such as scheduling "follow up activities," "receiving[ing] and shar[ing] all information related to that customer's contact with the company," and "identify[ing] customer as a potential customer for accessories." *Id*. at 24. Finally, Newegg contends that if an event has "occurred previously," this occurrence logically must be *at least the second occurrence* of the same event. *Id*. at 25.

With respect to this dispute, there is no legally sound reason to confine the claims beyond the literal syntax of the express words and the prior construed terms. Grammatically, the general rule is that the first mention of a noun is preceded by *a* or *an* and subsequent references to the same noun are preceded by *the* or *said*. As an example, the second mention of "sales process" ("the sales process") refers back to the first mention ("a sales process") and both relate to the same "process of selling goods or services, including two or more phases such as lead generation, time with customer, order management, and customer retention" (the construction for "sales process."). The same analysis applies for the events. Therefore, the claim syntax, combined with the prior constructions of "event" and "sales process," is sufficient to resolve the parties' dispute, and this term does not require separate construction.

**"context"/"infer[ring] . . . a context"**

"Context" appears in Claims 1–4, 15, 16, 18–21, 24, 27, 28, 30, 32, and 40 of the '525 Patent. In the *Infor* case, the Court adopted the parties' agreed construction: "information already existing within the system that becomes relevant upon the occurrence of an event." *Infor* opinion,

19

**A0025**

at 7. The Court adopted the same definition in the *1-800-Flowers* case. First *1-800-Flowers* opinion, at 15. SFA proposes the Court's prior construction. The Amazon Defendants propose "the circumstances in which an event occurs, a setting."

"[I]nfer[ring] . . . a context" appears in Claims 1, 20, and 40 of the '525 Patent. The Court previously construed this term as "logical process by which the fact that information already existing within the system becomes relevant upon the occurrence of an event is derived by application of logical rules." First *1-800-Flowers* opinion, at 17–18. While originally the parties advocated for different constructions, at the *Markman* hearing the parties reached an agreed construction that adds "to known or assumed facts" to the end of the Court's prior construction.[4] Thus, "infer[ring] a context" is construed as a "logical process by which a context is derived by application of logical rules to known or assumed facts." Further, "context"—consistent with the Court's prior construction—is construed as "information already existing within the system that becomes relevant upon the occurrence of an event."

**"infer[ring] . . . occurrence of the event [occurring within/in the system]"**

This term appears in Claims 1, 20 and 40 of the '525 Patent. SFA argues no construction is needed or, if construed, the prior constructions of "infer[ring]" and "event occurring within/in the system" should be combined to read: "logical process by which an occurrence of the event is derived by application of logical rules." The Amazon Defendants propose "a logical process by which the fact that a hardware or software operation internal to the system has occurred is derived from known facts by the application of logical rules." The central dispute is whether the inferred event is necessarily the antecedent "event within the system."

---

[4] "The Court: It would read, 'logical process by which a context is derived by . . . application of logical rules to known or assumed facts.' . . . [D]o we have an agreement then that will be the definition by agreement? Is that agreeable to Defendants?. . . . Mr. Fowler: Your Honor, we prefer our construction, but this would be acceptable as an alternative. The Court: So do I take that as an agreement? Mr. Fowler: Yes, Your Honor. The Court: Plaintiffs agree? Mr. Fenster: Yes, sir." Case No. 6:09cv340, Docket No. 444 at 47–49.

A0026

SFA contends that, because the Court has previously construed both "infer[ring]" and "event occurring within/in the system," this new permutation that combines the two terms need not be separately construed. Case No. 6:11cv52, Docket No. 335 at 34. While SFA agrees that there is an antecedent basis for the term "the event," SFA believes that crafting the effects of that antecedent basis for the claim construction is improper. Case No. 6:11cv52, Docket No. 349 at 5. SFA contends that the normal rules regarding antecedent basis adequately define the scope of the claims such that no additional construction is necessary. *Id.*

The Amazon Defendants argue that their proposed construction clarifies that the event refers to the antecedent system event ("event occurring within the system"). Case No. 6:11cv52, Docket No. 339 at 11. Since that antecedent term has already been construed as "an operation of the software or hardware making up the sales system," Defendants argue that their construction correctly clarifies that "the event" refers back to that same internal event. *Id.*

Defendants' proposal amounts to a request to clarify claim syntax by adding an overlapping claim construction. However, applying ordinary principles of claim syntax is sufficient to resolve the parties' dispute. For example, Claim 1 of the '525 Patent recites "detecting one or more changes in state characteristic of *an event occurring within the system*, inferring occurrence of *the* event and a context in which *the* event occurred" (emphasis added). It is clear that the second two mentions of "the" event refer to the antecedent "event occurring within the system." No further construction is necessary.

**"lead"**

This term appears in Claims 5–10, 12, 33–37, 39, and 42 of the '525 Patent and Claims 5–10, 12, 20–24, and 26 of the '341 Patent. SFA argues that no construction is necessary. Newegg proposes "an individual determined to be a potential customer based on previously

A0027

obtained information relating to the individual's identity, prior purchases, and product interests." The dispute is whether "lead" must be a potential customer.

SFA argues that "lead" should be given its plain and ordinary meaning. Case No. 6:09cv340, Docket No. 425 at 15. SFA contends that Newegg's definition of a lead as "an individual determined to be a potential customer" conflicts with the specification. *Id*. at 16. For example, the specification differentiates between a lead and a potential customer where it states that "[c]onventional lead management systems . . . assist sales personnel in developing customer leads into potential customers." '341 patent, 1:46–48. *Id*. at 16. According to SFA, Defendant's construction of "lead" would render this statement redundant. *Id*.

Newegg argues that both the claims and specification use "lead" to refer to a "potential customer." Case No. 6:09cv340, Docket No. 430 at 16–17. For example, the specification explains that one subsystem's goal is "committing a customer to a specific purchase, i.e., converting the 'lead' into a purchasing customer." *Id*. at 17 (citing '341 Patent, 8:51–54). The specification also recites an event manager that can suggest "that the particular customer may be a prospective lead." *Id*. (citing '341 Patent, 15:4–11). Newegg concludes that these equivalencies mean "lead" is an "individual determined to be a potential customer" based on several pieces of information: the individual's identity, prior purchases, and product interests. Newegg contends that the specification supports a construction that includes this information because it recites that "information such as names, addresses, and product interests of potential customers is gathered. . . . Sales information . . . such as information previously gathered, purchased databases, or previous customers, may also be used in conjunction with the lead generation component to identify potential customers." '341 Patent, 8:21–31.

A0028

Newegg's argument must be rejected because it seeks to replace the ordinary meaning of a common word—lead—with strict limitations gleaned from merely anecdotal comments in the specification. Newegg's proposal to limit a "lead" to a "potential customer" would require a special definition or disavowal, neither of which is present here. The specification plainly uses the word "lead" in contexts where it does not refer to an individual determined to be a potential customer: "[c]onventional lead management systems have been developed, for example, to assist sales personnel in *developing customer leads* into *potential customers*." '341 patent, 1:46-48 (emphases added). Here, a lead only has the possibility, if developed, of *becoming* a "potential customer." The specification also mentions "lead" as just one of various types of data. For example: "Each of the above-described components are driven in some respect by data and information, such as prices, specifications, competition, features and benefits, leads, names, financing, sales programs, etc." '341 Patent, at 11:2-6. It would make no sense to replace "lead" with "individual determined to be a potential customer" in such cases. Since a jury will understand the term lead as it applies in each context of the claim better than any definition that attempts to narrow or broaden the common understanding of the term, no construction is necessary.

**"first memory storing a plurality of rules"**

This term appears in the Claims 4, 19, and 32 of the '341 Patent. Claim 4 is representative of the patent's usage of the term:

> The system of Claim 1, further comprising: a first memory storing a plurality of rules, each rule indicating at least one subsequent action to be taken by a subsystem of the sales system upon occurrence of a corresponding event occurring in a particular context; and a decision subsystem to identify a rule stored in the first memory corresponding to the event and for initiating operation of the particular subsystem based on the identified rule.

A0029

'341 Patent, 39:23–32. SFA argues that no construction is necessary. Newegg proposes "a database of stored rules functionally separate from the event manager; a rule is a statement which prescribes that on the occurrence of a particular event, another event or action is initiated." The disputes are: (1) whether the claimed memory must be implemented in a *database*; and (2) whether this term refers to something *functionally separate* from the event manager.

### 1) Database Requirement

Newegg argues that a database is required because a rule-storage database is included not just in one preferred embodiment, but in every embodiment of the '341 Patent. Case No. 6:09cv340, Docket No. 430 at 29. Newegg contends that every mention of the term "memory" appears in reference to storage of various databases. *Id*. at 29–30. Newegg reasons that since the patent offers no alternative arrangements, this embodiment is not a "mere recommendation," it is a requirement. *Id*. at 29, quoting *Snow v. Lake Shore & M.S. Ry. Co*., 121 U.S. 617, 630 (1887).

SFA asserts that there is no indication that these common words—"memory," storage," and "rules"—have a special meaning in the context of these claims. Case No. 6:09cv340, Docket No. 425 at 14. Further, SFA believes Newegg's proposed construction improperly seeks to limit the term to a preferred embodiment by requiring a database. *Id*. SFA argues that neither the claims nor the specification require a database. Case No. 6:09cv340, Docket No. 436 at 10

Newegg's specification-based proposal improperly limits the "first memory storing a plurality of rules" to a database. Although claims "must be read in view of the specification, of which they are a part," "[t]he written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims." *Markman*, 52 F.3d at 979–80. Further, even if the specification recites only one preferred embodiment as Defendants suggest, the Federal Circuit has "expressly rejected the contention that if a patent describes only a single

A0030

embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1312 (citing *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1366 (Fed. Cir. 2004)). The concept of "memory," and its various alternatives, was well understood at the time the patent was filed, and there is no reason to limit this common technical term to a single embodiment.

### 2) Functionally Separate Requirement

Newegg contends that every figure of the '341 patent supports a construction that clarifies that the first memory is functionally separate from the event manager. Case No. 6:09cv340, Docket No. 430 at 30.

SFA responds that Newegg's proposed introduction of "functionally separate" would add limitations that do not relate to any part of the term. Case No. 6:09cv340, Docket No. 436 at 10. SFA argues that the figures to which Newegg points as evidence that the memory is functionally separate are actually conceptual diagrams showing blocks separated to represent different concepts, not necessarily a functional separation. *Id.* Therefore, SFA contends that the Court should reject Newegg's definition and conclude that this term does not need construction. *Id.*

There is no legal basis to add a functional-separation limitation to the claims. Newegg's argument regarding the drawings' separate representation of memory and the event manager effectively suggests that "functional separation" should be imported to every patent claim with similar underlying illustrations. Therefore, "first memory storing a plurality of rules" does not need construction.

### "time with customer subsystem"

This term appears in Claims 5, 6, 8, 9 and 10 of the '525 Patent. SFA contends no construction is necessary. The Amazon Defendants propose "the subsystem used by a salesman

that includes a product information module, a customer requirements module, a quote preparation module, a finance module, a proposal generation module, a presentation module, a life cycle module, a performance evaluation module, and a competitive comparison module." Newegg proposes "a subsystem that assists a salesperson in converting a lead into a buying customer, and that stores information about the amount of time a salesperson spends with a customer." The parties dispute whether this term requires a specific, salesperson-focused definition.

SFA argues that no further construction is necessary because the Court previously construed both "subsystem" and "plurality of subsystems" for the '525 Patent in the *Infor* opinion. 6:11cv52, Docket No. 335 at 21–22. Further, SFA believes "time with customer" needs no construction, as it simply refers to a subsystem that "relate[s] to the details occurring during the time a customer spends with the system." *Id.* at 22. SFA contends that Defendants' proposed constructions improperly seek to import limitations from a specific embodiment, such as "salesman," "product-information module," "customer-requirements module," and "quote-preparation module." *Id.*

The Amazon Defendants argue that this term has no plain and ordinary meaning and must therefore be construed according to the '525 Patent's specification. Case No. 6:11cv52, Docket No. 339 at 17. The Amazon Defendants contend that the specification only recites a "time with customer subsystem" used by a salesperson:

> the time with customer component is used ***by salespeople*** when they are with a customer or preparing a proposal or presentation for a customer in order to generate a sale of the product or service. The integrated subcomponent modules facilitate interaction between ***the salesperson*** and the customer through the sales process to develop specific solutions that meet the customer's needs, thereby enabling ***the salesperson*** to close the sale as described above.

*Id.*, quoting '525 Patent at 12:12–20 (emphases added).

A0032

Further, the Amazon Defendants argue that the construction should include the specific components provided in the specification:

> The subcomponent modules [of the time with customer subcomponent] include a product information module 402, a customer requirements module 404, a configuration module 406, a quote preparation module 408, a finance module 410, a proposal generation module 412, a presentation module 414, a life cycle module 416, a performance evaluation module 418, a competitive comparison module 420, among other modules.

'525 Patent at 11:64–12:7.

Newegg proposes a construction with two components: (1) that the system assists a *salesperson* in converting a lead into a buying customer; and (2) that it stores information about the *amount of time* a salesperson spends with a customer. Case No. 6:09cv340, Docket No. 430 at 14. According to Newegg, this comports with the '341 patent's specification, which indicates that the time with customer subsystem "is used by the salesperson during the phase of the sales process which occurs from the time a qualified lead is identified to the time a sale is completed and an order is created." *Id.* at 15 (quoting '341 Patent at 8:45–48). Further, Newegg argues that the claims recite a system that "receives necessary information . . . and stores information obtained during the time spent with the customer . . . ." *Id.* (quoting '341 Patent at 9:14–20). Newegg argues that the prosecution history of a predecessor to the '341 Patent confirms that "time with customer" involves a salesperson because the inventors distinguished prior art based on the fact that the "time with customer subsystem" stores information about the amount of time a salesperson spends with a customer. *Id.* at 15–16.

The term clearly and unambiguously defines itself—a subsystem related to the "time with a customer." This simple conclusion is clear when reading the description found in the '525 Patent: "[T]he time with customer component 104 is used by salespeople when they are with a customer . . . in order to generate a sale of the product or service." '525 Patent, 12:13–16.

A0033

Defendants' proposed constructions improperly incorporate only select embodiments. Defendants' common request to incorporate a salesperson is also improper. The Court has already determined that, in absence of an express claim limitation, the intrinsic record does not support limitations requiring use by a salesperson to the exclusion of other potential embodiments. First *1-800-Flowers* opinion, at 13. The patent certainly teaches the use of websites or kiosks as proxies for sales persons. '341 Patent at 15:11–30. Further, the teachings imply that a website can replace a salesperson. '341 Patent at 15:20–24.

Newegg's proposal that the system stores information about the amount of a time a salesperson spends with a customer is directly contradicted by one of the specification sections that Newegg cites. Docket No. 430 at 15 (citing '341 Patent at 9:14–20). The specification recites a system that stores information, not about the *amount of time* spent with a customer but rather about "information *obtained during time* spent with the customer." '341 Patent, 9:14–20 (emphasis added).

Defendants' proposed constructions improperly incorporate only select embodiments. Thus, no construction of this term is necessary.

### MOTIONS FOR SUMMARY JUDGMENT OF INDEFINITENESS

Defendants move for summary judgment of invalidity for indefiniteness on three grounds: (1) apparatus claims reciting method steps; (2) insoluble ambiguity of the preamble term "intelligently integrating;" and (3) insoluble ambiguity of the wherein clause. For the reasons set forth below, the Court **DENIES** these motions for summary judgment.

### APPLICABLE LAW

"Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

A0034

law." *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed. Cir. 1994); FED. R. CIV. P. 56(c). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). If the moving party meets this burden, the nonmoving party must then set forth "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see also T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

A party seeking to invalidate a patent must overcome a presumption that the patent is valid. *See* 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. Partn'p*, 564 U.S. __, 131 S. Ct. 2238, 2243 (2011); *United States Gypsum Co. v. National Gypsum Co.,* 74 F.3d 1209, 1212 (Fed. Cir. 1996). This presumption places the burden on the challenging party to prove the patent's invalidity by clear and convincing evidence. *Microsoft,* 131 S.Ct. at 2243; *United States Gypsum Co.,* 74 F.3d at 1212. Close questions of indefiniteness "are properly resolved in favor of the patentee." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1348 (Fed. Cir. 2005); *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1380 (Fed. Cir. 2001).

Claims must particularly point out and distinctly claim the invention. "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112 ¶ 2. The primary purpose of the requirement of definiteness is to provide notice to those skilled in the art of what will constitute infringement. *See United Carbon Co. v. Binney Co.,* 317 U.S. 228, 236 (1942). The definiteness standard is one of reasonableness under the circumstances, requiring that, in light of the teachings of the prior art and the invention at issue, the claims apprise those skilled in the art of the scope of the invention with a reasonable degree of precision and particularity. *See*

A0035

*Shatterproof Glass Corp. v. LibbeyOwens Corp.,* 758 F.2d 613, 624 (Fed. Cir. 1985). To rule "on a claim of patent indefiniteness, a court must determine whether one skilled in the art would understand what is claimed when the claim is read in light of the specification." *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1372 (Fed. Cir. 2004). "A determination of indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims, [and] therefore, like claim construction, is a question of law." *Amtel Corp. v. Info. Storage Devices, Inc.,* 198 F.3d 1374, 1378 (Fed. Cir. 1999).

## ANALYSIS

### 1. Motion for Summary Judgment of Indefiniteness for Impermissible Mixing of Method and Apparatus Claims

Claim 1 of the '525 Patent and Claim 27 of the '341 Patent recite a "computer implemented sales system," and Claim 1 of the '341 Patent recites an "automated sales system." Newegg contends that these claims improperly mix method steps into a systems claim and move for summary judgment of indefiniteness on these claims. Case No. 6:09cv340, Docket No. 433.

The following claim is representative of the disputed language:

> *A computer implemented sales system* used to facilitate a sales process, the system comprising: a plurality of subsystems configured to facilitate one or more actions performed during at least one phase of the sales process; and an event manager, coupled to the subsystems, the event manager *detecting one or more changes* in state characteristic of an event occurring within the system, *inferring occurrence of the event and a context* in which the event occurred based at least in part on the detected changes in state, and *automatically initiating an operation* in one or more particular subsystems of the computer to facilitate a new action based on the inferred context.

'525 Patent, 35:63–36:10 (emphasis added).

A single claim that recites two separate statutory classes of invention, e.g., "an apparatus and a method of using that apparatus," renders the claim indefinite under 35 U.S.C. § 112 ¶ 2. *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005). The problem

A0036

with mixing apparatus and method steps is that such mixed claims fail to clarify "whether infringement would occur when one creates a system that allows the user to [perform the step] . . . or . . . when the user actually [performs the step]." *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1277 (Fed. Cir. 2012). "[S]uch a claim 'is not sufficiently precise to provide competitors with an accurate determination of the "metes and bounds" of protection involved' and is 'ambiguous and properly rejected.'" *Id.* (quoting *Ex parte Lyell*, 17 U.S.P.Q.2d 1548 (1990)). However, apparatus claims that are limited by functional language are not necessarily indefinite. *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) (citing *Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008)). If the functional language of the claim merely describes "the structure and capabilities of the claimed apparatus," then the claim is sufficiently definite under 35 U.S.C. § 112 ¶ 2. *SynQor, Inc. v. Artesyn Techs., Inc.*, 2010 U.S. Dist. LEXIS 74808, at *97 (E.D. Tex. July 26, 2010), *aff'd SynQor v. Artesyn Techs. Inc.*, No. 2011-1192 (Fed. Cir. March 13, 2013) (citing *Microprocessor*, 520 F.3d at 1375).

Newegg argues that the claims at issue impermissibly mix apparatus claims with method steps because they recite a system and use verbs such as detecting, initiating, inferring, determining, and updating to recite method steps. Case No. 6:09cv340, Docket No. 433 at 4. Newegg contends that this mixture is impermissible because the public does not receive fair notice of whether infringement occurs when a system with the claimed capabilities is created, or when the system is used to perform the claimed steps. *Id*. at 9. Although Newegg acknowledges that an apparatus claim can use similar verbs as functional language to recite system capabilities, Newegg contends the present limitations are not functional language because they describe an action that must be performed to use the apparatus and lack the phrase "configured to" or similar

A0037

language to introduce it as a description of the system's capabilities. *Id.* at 6. As a result, Newegg argues that the Court should invalidate the claims that use these terms rather than engage in "claim saving" to fix the patentee's invalid choice of claim language. 6:09cv340, Docket No. 437 at 5.

SFA counters that the claims do not impermissibly mix apparatus and method limitations. Instead, SFA argues that the claims merely use functional language to describe the system by means of what it does. Case No. 6:09cv340, Docket No. 435 at 3. Further, SFA disagrees with Newegg's suggestion that "configured to" or similar language is required to mark functional language that describes system capabilities. *Id.* at 7–8. SFA contends that it is common for computer-implemented systems that include software to be claimed with functional language describing the software's capabilities. *Id.* at 4. In Claim 1 of the '525 Patent, for example, the system "detect[s]," "infer[s]," and "initiat[es]." *Id.* at 7–8. As a result, infringement would occur upon constructing a system with those capabilities.

Defendants cite to *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005), *Katz Interactive Call Processing Patent Litigation v. Am. Airlines, Inc.*, 639 F.3d 1303, 1318 (Fed. Cir. 2011), and their progeny, and argue the claims at issue similarly mix method and apparatus claims. However, the claims in those cases suffered from a true ambiguity as to whether the claims require building a product or performing a method. In particular, those cases involved apparatus claims incorporating steps where a user acts *upon the system*. Here, the claims involve capabilities *of the system*, as limitations on the "event manager" and "subsystem" structural elements. The functional language merely describes the functional capability of the claimed structures. Therefore, there is no uncertainty about when infringement would occur—it plainly occurs when a system is created that can perform the claimed functions.

A0038

Further, the language present in the claims is functional despite the lack of "configured to" or similar wording. Claim 1 of the '525 Patent and Claims 1 and 27 of the '341 Patent claims recite components of the sales system: a plurality of subsystems and an event manager. Verbs such as "detect[ing]," "infer[ring]," and "initiat[ing]" serve to recite the system's capabilities. One of ordinary skill in the art would understand that Claim 1 of the '525 Patent and Claims 1 and 27 of the '341 Patent are limited to an apparatus, and that any infringement occurs upon creation of the claimed system. *See Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1319 (Fed. Cir. 2003) (finding that the party seeking to invalidate a claim as indefinite must show by clear and convincing evidence that one skilled in the art would not understand the scope of the claim when read in light of the specification).

Defendants have failed to show by clear and convincing evidence that these claims are insoluble due to an impermissible mix of apparatus limitations and method steps. Accordingly, Defendants' motions for summary judgment of indefiniteness of Claim 1 of the '525 Patent and Claims 1 and 27 of the '341 Patent are **DENIED**.

2. **Motion for Summary Judgment of Indefiniteness due to Insoluble Ambiguity of "Intelligently Integrating"**

The preambles of Claims 1 and 31 of the '341 Patent recite an "automated sales system for intelligently integrating into a single system tools used by a salesperson in the sales process." '341 Patent, 38:64–66, 42:22–24. Both the Amazon Defendants and Newegg contend that the "intelligently integrating" phrase is insolubly ambiguous, and move for summary judgment of indefiniteness on these claims. Case No. 6:09cv340, Docket No. 433; Case No. 6:11cv52, Docket No. 338.

A0039

A preamble is limiting "if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808, 62 USPQ2d 1781, 1784 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305, 51 USPQ2d 1161, 1165 (Fed. Cir. 1999)). "[A] claim preamble has the import that the claim as a whole suggests for it. In other words, when the claim drafter chooses to use both the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects." *Bell Commc'ns. Research, Inc. v. Vitalink Commc'ns. Corp.*, 55 F.3d 615, 620, 34 USPQ2d 1816, 1820 (Fed. Cir. 1995). When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention. *See, e.g., Electro Sci. Indus. v. Dynamic Details, Inc.*, 307 F.3d 1343, 1348, 64 USPQ2d 1781, 1783 (Fed. Cir. 2002); *Rapoport v. Dement*, 254 F.3d 1053, 1059, 59 USPQ2d 1215, 1219 (Fed. Cir. 2001); *Pitney Bowes*, 182 F.3d at 1306, 51 USPQ2d at 1166. On the other hand, "if the body of the claim sets out the complete invention," then the language of the preamble may be superfluous. *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1310, 64 USPQ2d 1832, 1837 (Fed. Cir. 2002); *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1373–74, 58 USPQ2d 1508, 1512 (Fed. Cir. 2001).

SFA argues that "intelligently integrating" does not render Claims 1 and 31 of the '341 Patent indefinite because it is not a limitation. Case No. 6:11cv52, Docket No. 350 at 2–3. SFA contends that although the Court previously held that the preamble of Claim 1 of the '525 is a limitation, that holding does not extend to the related claims in the '341 preamble, which contain additional language including "intelligently integrating." *Id*. Finally, SFA argues that

A0040

"intelligently integrating" is not necessary to understand the claim, since the body of the claims in the '341 Patent sets out a complete invention. *Id.* at 3.

The Court previously found the preambles of Claim 1 and Claim 40 of the '525 Patent to be limiting. First *1-800-Flowers* opinion, at 12. The preambles of Claims 1 and 31 of the '341 Patent are similar, but not identical. For comparison, the preamble of Claim 1 of the '525 Patent recites:

> A computer implemented sales system used to facilitate a sales process, the system comprising: . . .

35:63–64. The preamble of Claim 1 of the '341 Patent recites:

> An automated sales system for facilitating a sale of an item or service by intelligently integrating into a single system tools used by a salesperson in a sales process, the automated sales system comprising: . . .

38:64–66; 42:22–24. Although the '341 Patent is a continuation of the '525 Patent, no preamble phrase is transferred intact to the newer patent—all are rephrased or expanded. '341 Patent at 1:6–20. Therefore, it is not a given that the Court's previous finding extends to the preambles of Claims 1 and 31 of the '341 Patent.

For a preamble to be limiting it must be "'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l*, at 808. Defendants simply assume that the preambles of Claim 1 and 31 of the '341 Patent are limiting, and focus their argument on whether the preamble term "intelligently integrating" is so insolubly ambiguous that it renders the claim indefinite. Defendants contend that "intelligently integrating" is insolubly ambiguous because intelligence is a subjective word of degree, and the patent provides no standard for determining whether a sales system has been intelligently integrated rather than merely integrated. Case No. 6:09cv340, Docket No. 433 at 9; Case No. 6:11cv52, Docket No. 338 at 5–6. By Defendants' own

A0041

arguments, then, "intelligently integrating" cannot be necessary to give meaning to the claim. Accordingly, the law does not elevate this preamble phrase to a substantive claim limitation.

Furthermore, even if "intelligently integrating" were a limitation, it is not insolubly ambiguous. "Intelligently" refers to the computer-science form of intelligence, which is a mere reference to "processing capability." *See* THE COMPUTER GLOSSARY: THE COMPLETE ILLUSTRATED DICTIONARY, Alan Freedman, 9th Ed. (2001). The subject claims do not employ the word "intelligently" as a word of degree. Rather, the word helps describe the affirmative claim limitations as relating to integration by computer processing.

In sum, Defendants do not provide a meritorious basis for either finding the preamble language a limitation or finding such language insolubly ambiguous. Accordingly, Defendants' motions for summary judgment of indefiniteness of Claims 1 and 31 of the '341 Patent are **DENIED**.

3. **Motion for Summary Judgment of Indefiniteness due to Insolubly Ambiguous Wherein Clause**

Independent Claims 1, 13, 27, 31, 32 and 33 of the '341 Patent recite the following wherein clause:

> wherein at least one subsystem of the plurality of subsystems determines if the event has occurred previously in the sales process and updates another event or task in at least another subsystem of the plurality of subsystems if the operation is automatically initiated

'341 Patent, 39:11–16; 40:36–40; 41:61–65; 44:17–21; 42:44–51; 43:9–13. The Amazon Defendants contend that this wherein clause is insolubly ambiguous and move for summary judgment to invalidate these claims as well as their dependent claims. Case No. 6:11cv52, Docket No. 338 at 8, 14.

A0042

The Amazon Defendants contend that the wherein clause is insolubly ambiguous due to three ambiguous terms: "determines if the event has occurred previously;" "if the operation is automatically initiated;" and "updates another event or task." *Id*. at 8–12. First, Defendants contend that the claim does not define what effect the determination mentioned in "determines if the event has occurred previously" has on "updat[ing] another event or task." *Id*. at 8. If the later event or task is updated, there is no indication if that happens only if the event has occurred previously, only if it hasn't occurred previously, or either way. *Id*. at 8–9. The Amazon Defendants contend that neither the specification nor the prosecution history shed light on this issue. *Id*. at 9.

Second, the Amazon Defendants contend that the wherein clause recites the condition "if the operation is automatically initiated," but does not indicate which of the first two steps is conditioned by the automatic initiation. *Id*. The Amazon Defendants argue that this ambiguity, combined with the ambiguity arising from "determines if the event has occurred previously," can result in six different but equally plausible interpretations, thus making it impossible for one of ordinary skill in the art to determine if a product infringes. *Id*.

Third, the Amazon Defendants contend that the step requiring the system to "update[] another event or task" is insolubly ambiguous because the patent does not disclose how to update an event or task. *Id*. at 11–12. As the patent generally refers to an "event" simply as something that has happened, the Amazon Defendants argue it is unclear how an event can be updated. *Id*. at 12. The Amazon Defendants submit that the specification provides no guidance because it refers to updating information or modules but never to updating events. *Id*. at 12–13. Therefore, the Amazon Defendants claim that the updating step is indefinite and, in combination with the

A0043

previously mentioned ambiguities, the '341 Patent's independent claims and their dependent claims should be invalidated. *Id*. at 13.

SFA argues that the wherein clause is not indefinite because there is no dependent relationship between the phrases as Defendants contend. Docket 350 at 7. According to SFA, the clause simply requires a subsystem that can perform two functions: (1) determine if the event occurred previously; and (2) update another event or task in another subsystem if the operation is automatically initiated. *Id*. As to the conditional phrase "if the operation is automatically initiated," SFA argues that it unambiguously modifies only the updating phrase. *Id*. at 7–8. As support, SFA points to the rule of the last antecedent, which holds that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Id*. at 8. Finally, SFA argues that the term "update an event or task" is not ambiguous because the specification does disclose the ability to update both tasks and events. *Id*. at 10. For example, the specification discloses that the event manager may "recognize operations carried in the customer satisfaction module . . . and may direct the self management component 102 to automatically insert tasks . . . ." *Id*. at 10 (quoting '341 Patent, 22:40–50). The time management module also recites the ability to update tasks by "drag[ging] and drop[ping]" them. *Id*. at 10 (quoting '341 Patent, 24:8–25). Likewise, SFA contends that the specification recites ways to update events: pairing or grouping (34:38–55), and linking (36:12–23). *Id*. at 11.

A claim may escape a finding of indefiniteness "[i]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable people will disagree . . . ." *Exxon Research and Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). In the wherein clause at issue, the claim language does not indicate any dependent relationship, nor is such a relationship necessary to understand the clause as

A0044

written. A simple conjunction—"and"—joins the two functions of the claimed subsystem. Therefore, one of ordinary skill can determine that the claims require a subsystem that can perform both the determining step and the updating step recited in the wherein clause. As to the phrase "if the operation is automatically initiated," the most plausible conclusion is the one suggested by SFA under the grammar rules—that this phrase conditions only the nearest antecedent. Although Defendants may disagree about this meaning, the language does not reach a level of indefiniteness such that no meaning is discernible. *Id.*

The Amazon Defendants argue that the limitation "updates another event or task" is insolubly ambiguous because neither the specification nor the prosecution history of the '341 Patent discloses how to update an event. Case No. 6:11cv52, Docket No. 338 at 11. While Defendants' position facially refers to specification support, at the core of this argument is Defendants' allegation that the concept of "updating" is hopelessly unclear because "events" are something that happen, an occurrence. *Id.* at 11–2. It is evident both from the specification (e.g. Figure 21) and the Court's prior constructions that "events" are generally something that happens. In that respect, the Court has already defined "event occurring within the system" as "an operation of the software or hardware making up the sales system." The Court has also defined "event occurring in the sales process," as "a real life action or inaction that occurs in the sales process." Even though "events" are generally occurrences, the specification is clear that events are recorded. This disclosure is implicit throughout the specification, for example in discussing events that are tied together. '341 Patent, 34:38-55. In addition, the specification discloses specific embodiments where "events" are preserved as records in a database:

> The rules may prescribe that on the occurrence of a particular event, ***an event record is examined in the event manager database*** to determine if other related events have occurred, and if the other events have occurred, the rules may indicate that another sales event should be initiated.

A0045

'341 at 35:48–53 (emphasis added).

> Typical operation of the event manager 201 will now be described. In the disclosed embodiment, upon the occurrence of an application event using the business object 1908, the business object 1908 exposes 1914, *the event and associated event handlers to the event managing unit 1904, and the information contained in the exposed event is used by the event managing unit 1902 to create or update a database in the event manager database 1904*.

'341 at 35:23–40 (emphasis added). Given the breadth of the disclosure, including the embodiment that discloses the recording of events in a database, one skilled in the art would understand how to create or update such a record. And more importantly, the skilled artisan would understand the claim language relating to updating an event. In view of the specification, the skilled artisan would recognize that claim language regarding updating an event refers to updating the record of an event, however that record is maintained. Finally, Defendants' argument and much of the briefing relies mostly upon the extent of disclosed embodiments and very little upon an alleged ambiguity in the claim words. Though claims must be read in view of the specification, the issue of indefiniteness is whether the claim words are discernable. Here, the disputed words are discernable in view of the specification and thus, the claim is not indefinite. Therefore, the Court **DENIES** Defendants' motion for summary judgment of indefiniteness of the '341 Patent's independent claims 1, 13, 27, 31, 32 and 33 and their dependent claims.

## CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above. For ease of reference, the Court's claim interpretations are set forth in a table as Appendix A. Further, the Court hereby **DENIES** Defendant Newegg's Motion for Partial Summary Judgment of Indefiniteness (Docket No. 433) and Defendants Amazon, Inc., et al.'s Motion for Partial Summary Judgment of Indefiniteness (Docket No. 338).

So ORDERED and SIGNED this 11th day of April, 2013.

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

# APPENDIX A

| Claim Term | Court's Construction |
|---|---|
| 1. sales process | a process of selling goods or services, including two or more phases such as lead generation, time with customer, order management, and customer retention |
| 2. facilitate/facilitating | No construction |
| 3. [facilitate a] new action | No construction |
| 4. computer implemented sales system/automated sales system | No construction |
| 5. event manager | hardware and/or software that is within a computer implemented sales system |
| 6. detecting/detect one or more changes in information regarding an event | No construction |
| 7. event occurring within the system/event occurring in the system | an operation of the software or hardware making up the sales system |
| 8. the event has occurred previously in the sales process | No construction |
| 9. context | information already existing within the system that becomes relevant upon the occurrence of an event |
| infer[ring] . . . a context | logical process by which a context is derived by application of logical rules to known or assumed facts |
| 10. Infer[ring]. . . occurrence of the event [occurring within/in the system] | No construction |
| 11. lead | No construction |
| 12. first memory storing a plurality of rules | No construction |
| 13. time with customer subsystem | No construction |

A0048

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| SFA SYSTEMS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CASE NO. 6:09-CV-340 |
| | § | |
| 1-800-FLOWERS.COM, INC., et al., | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| SFA SYSTEMS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CASE NO. 6:10-CV-300 |
| | § | |
| BIGMACHINES, INC, et al., | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court is Defendants' Rule 72 Objections and Motion for Reconsideration (Docket No. 336). The matter has been fully briefed (Docket Nos. 336, 348 & 361).

Having reviewed the parties' submissions, the Court is of the opinion that the Magistrate Judge's construction of the disputed terms is correct, with the following clarification. The Magistrate Judge construed "inferring . . . a context" as "logical process by which the fact that information already existing within the system that becomes relevant upon the occurrence of an event is derived by application of logical rules." Docket No. 333, at 17. Defendants object to the

A0049

construction because it "is unintelligible and does not appear to be grammatically or logically correct." Docket No. 336, at 13.

The Magistrate Judge construed the term "context" as "information already existing within the system that becomes relevant upon the occurrence of an event." Docket No. 333, at 16. The construction of "inferring . . . a context" incorporates this recommended construction of "context." Thus, the construction for "inferring . . . a context" can be written more concisely as "logical process by which a *context* is derived by application of logical rules." The Court shall present this alternate form of the construction of "inferring . . . a context" to the jurors and note that the term "context" has also been defined by the Court.

Accordingly, the Court **ADOPTS** the Opinion of the United States Magistrate Judge as the opinion of this Court, with the above clarifying comments. All objections are overruled and all motions for reconsideration are **DENIED**.

**So ORDERED and SIGNED this 30th day of May, 2012.**

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

2

A0050

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **SFA SYSTEMS, LLC** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| | § | **CASE NO. 6:09-CV-340** |
| **vs.** | § | **PATENT CASE** |
| | § | |
| **1-800-FLOWERS.COM, INC., et al** | § | |
| | § | |
| **Defendants.** | | |

| | | |
|---|---|---|
| **SFA SYSTEMS, LLC** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | **CASE NO. 6:10-CV-300** |
| **vs.** | § | **PATENT CASE** |
| | § | |
| | § | |
| **BIGMACHINES, INC., ET AL.** | § | |
| | § | |
| **Defendants.** | | |

### MEMORANDUM OPINION AND ORDER

This case was referred for claim construction only. This opinion construes the terms in

United States Patent No. 6,067,525 (the "'525 patent"). Also before the Court is Defendants'

Motion to Strike Undisclosed Evidence from SFA's P.R. 4-5(c) Brief (Docket No. 274), which

the Court **DENIES**.

### BACKGROUND

SFA asserts both method and systems claims from the '525 patent. The '525 patent is

directed to a sales force automation system that integrates intelligent, automated salesperson

1

A0051

support for multiple phases of the sales process. '525 patent, Abstract. The invention is intended to intelligently integrate into a single system tools used by a sales person in the sales process. *Id.* at 1:8–9. Generally, the invention is facilitated on a computer system and involves a number of subsystems that correspond to phases in the sales process along with an event manager. The computer detects the occurrence of an event and initiates an operation in another subsystem to facilitate a new event in the sales process based on the context of the first event. *See id.* at 2:21–55. This patent was previously construed in *SFA Systems, LLC v. Infor Global Solutions (Michigan), Inc.*, 6:07cv67, Docket No. 211, 2009 WL 440559 (E.D. Tex. Feb. 23, 2009) (Davis, J.).

## APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of

2

particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id*. Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*. Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also

3

define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

## ANALYSIS

### "Sales process"

SFA contends this term should be construed as "the process of selling goods or services, which may include, but is not limited to, generating a lead, completing a sale, managing an order, retaining a customer, or any other interaction with a customer throughout this process." Defendants contend the term means "the lead generation, time with customer, order management, and customer retention phases of selling." The parties' primary dispute is whether the term "sales process" requires all of the four particular "phases" of the disclosed embodiment.

SFA argues the claim language does not require every phase (i.e. all four disclosed

4

phases) as Defendants propose. Docket No. 107 at p. 8-9. To support its position, SFA first points to the claim language noting, for example, that the relevant claims call for facilitating actions performed "during at least one phase of the sales process." *Id.* at p. 8. SFA also argues a claim differentiation theory based upon dependent claims 5–12, which expressly "enumerate specific subsystems that *must* be involved in the claimed system." *Id.* at 9. SFA reasons that since particular subsystems correspond to various phases in the sales process, the independent claims should not be read to require facilitation of every phase of a sales process. *Id.* at 9–10. SFA contends the specification supports its interpretation and the applicant's statements during prosecution do not contradict this view. *Id.* at 10–11.

Defendants contend that the invention is described in the specification as a system or method that integrates *all* phases of the sales process. Response at p. 15–16. Defendants further contend that the claim language requires that each of the plurality of subsystems corresponds to at least one phase of the sales process and the preamble refers to the sales process rather than merely one phase of the sales process. *Id.* at 15. Defendants argue that during prosecution the applicant distinguished the prior art as addressing a particular event or only a small subset of tasks. *Id.* at 15–16. In sum, Defendants argue that the sales process must include all four named phases.

The Court construes "sales process" as "a process of selling goods or services, including two or more phases such as lead generation, time with customer, order management, and customer retention." The Court declines to use SFA's proposed phrase, "which may include, but is not limited to," because it conveys no useful meaning for the fact finder. Under SFA's construction, each of the four phases may or may not be included in the sales process and little else is required. Thus, SFA's construction is merely a simple restatement of the claim

5

term—"the process of selling goods or services." The remainder of its proposed construction does not limit the term or provide guidance to its meaning.

The Court agrees with Defendants that more than one phase is necessary in the claimed sales process. However, all four phases are not required to be included. The Abstract describes the invention as "integrat[ing] . . . *multiple* phases of the sales process." The Background of the Invention distinguishes the prior art systems that addressed only part of the sales process. After describing the various different components, the specification teaches that "each of the above described components may not be needed in a particular sales environment. . . . What is particularly advantageous, however, is that each of the components used in a particular sales system be fully integrated into a system which allows for a common exchange of relevant information between the various components used." '525 patent at 7:44–53. Thus, the specification contemplates that not all components will be used in every system, but the purpose of the system is to fully integrate at least two components.

Furthermore, the Court has examined the portions of the file history cited by Defendants, and there are no clear arguments over the prior art (e.g. Negrino) that would require defining the "sales process" to include all four disclosed phases. Moreover, the claims themselves are broadly drafted. They do not require particular phases of the sales process or subsystems that must be included. Thus, whether two or more accused sales "phases" satisfy the claim limitation is a fact question for the jury. Accordingly, the Court construes "sales process" as "a process of selling goods or services, including two or more phases such as lead generation, time with customer, order management, and customer retention." While the Court's construction identifies exemplar phases to assist the jury in identifying a "phase," a sales process is not limited to these particular phases.

6

**"event occurring within the system"/ "event occurring in the system"**

SFA contends these terms do not require construction. Alternatively, SFA argues they mean "any identifiable occurrence or happening, or lack thereof, which has significance for system hardware or software." Defendants contend the terms mean "a hardware or software operation that has occurred internal to the system."

SFA argues that the specification describes "application events" and "sales events." Docket No. 107 at 14 (citing '525 patent at 30:34–61). Based on this part of the specification, SFA contends an event occurring within the system is anything that occurs within the system that has some significance for the system hardware or software. It may be an operation performed by the system or the system's use of information to initiate another event. *Id.* at 14–15. Additionally, SFA cites Figures 21A-21E to argue that the lack of an "occurrence or happening" can also be an event.

Defendants contend that the proper construction of these terms (and the additional term "event occurring in the sales process") must incorporate the distinction between "sales events" and "application events." Response at 17 (citing '525 patent at 30:34–61). Defendants argue that SFA's proposed construction is improper because: it eliminates the express claim language requiring the event to occur "within" the system; it does not limit the event to a hardware or software operation; and it includes non-events such as the lack of an "occurrence or happening."

The Court construes "event occurring within the system" and "event occurring in the system" as "an operation of the software or hardware making up the sales system." The invention is intended to integrate a real-life sales process with events occurring in a computerized system. *See* '525 patent, Abstract ("A salesforce automation system which integrates computerized, intelligent automated salesperson support for multiple phases of the

7

A0057

sales process."). Events occurring within the *system* are distinct from events occurring in the *sales process* because the system is "computerized" and the "sales process" is real-world activity. *Id*. at 30:36–41 ("a sales event may be an event in the sales process, typically occurring between the salesperson and the customer, while an application event may be an internal operation of the sales system (i.e., the operation of the software and hardware making up the sales system) which is used to electronically facilitate the sales event").

The specification clearly teaches that there are two kinds of events: sales events that occur during the real-life sales process and application events that occur within the claimed computerized system. These two disclosed event types clearly correspond to the two claimed event types that are respectively, events occurring in the sales process and events occurring within/in the system. The specification supports this distinction, and the use of differing claim words bolsters that support. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119–20 (Fed. Cir. 2004) ("[W]hen an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms."). As a result, the Court cannot agree with SFA that the two types of events are the same. Any confusion between the terms results from the patentee's intentional failure to always distinguish between the two types of events:

> As can be appreciated, in many instances a sales event and its related application event may be used interchangeably to describe an event. In the discussion below, where a distinction between the two types of events is useful, the terms sales event and application event are used. Where the discussion applies more generally to both types of events the term event may be used in a more generic form.

'525 patent at 30:59–65. Although the patent does not always clearly distinguish between the two event types, the Court's construction makes clear that events occurring in the system are not

8

real-life sales events. Furthermore, as discussed below, while the "lack of a happening" may be an event occurring during the sales *process*, events within the *system* do not encompass a "lack of happening" or inaction. Accordingly, the Court construes "event occurring within the system" and "event occurring in the system" as "an operation of the software or hardware making up the sales system."

**"event occurring in the sales process"**

This term is used in Claim 20. SFA contends the term does not require construction or alternatively should be construed as "any identifiable occurrence or happening, or lack thereof, which is part of the sales process." Defendants originally proposed the term be construed as "a salesperson's action that has occurred external to the sales system" and then alternatively proposed "an action or inaction between a sales person and a customer that has occurred external to the sales system."

SFA argues the claim language does not limit who is responsible for causing the event to occur. Docket No. 107 at 17. SFA further contends the written description contains several examples where the customer initiates the event:

> For example, the events depicted in Figure 21A include "[a] customer contacts an Internet Web-Site to get product information," and "[a] customer uses a kiosk to gain information on a product or service and request[s] follow-up call from company representative." The events depicted in Figure 21D include "[c]ustomer directly contacts the manufacturer regarding a product problem," "[c]ustomer brings the product in [to] the dealer for service," and "customer approves the proposal and signs the order." The events depicted in Figure 21E include "[c]ustomer requests to know delivery date for product . . . ." The written description itself contains several examples of an event occurring during the sales process initiated by a customer or someone other than a "salesperson."

*Id*. SFA also argues that the patent does not limit events "occurring in the sales process" to events external to the sales system. *Id.* at 17–18.

9

A0059

In light of some of SFA's arguments, Defendants proposed a compromise construction: "an action or inaction between a sales person and a customer that has occurred external to the sales system." Defendants contend that sales events are events in the sales process and application events are internal operations of the sales system.

Notwithstanding Defendant's compromise proposal, the parties still disagree regarding: whether the event is necessarily a salesperson's action; whether the event must be between a salesperson and a customer; and whether an event in the sales process includes an inaction. The specification is clear that events occurring in the sales process are not limited to actions or inactions occurring between the sales person and customer. Figures 21A through 21E list many events that involve only a customer or a salesperson. *See, e.g.*, Fig.21A ("d) A customer contacts an Internet Web-site to get product information"). Furthermore, while events within the *system* cannot include inaction, events in the sales *process* may include inaction. As suggested by SFA, Figure 21A describes an event where a "[s]alesperson fails to make any initial contact or follow-up to a qualified lead." Further, Figure 21B describes an event where "[a] salesperson frequently fails to offer creative finance options when proposing a finance payment for a product purchase." These "inactions" are the non-occurrence of predetermined or expected events that are known to the "sales system." The parties are instructed to conform their trial arguments to this understanding of "inaction." Without such an understanding, anything under the sun (or the lack thereof) might satisfy the claim limitation.

Finally, the parties also dispute whether events occurring in the sales process are distinct from events occurring in the system. As explained above, there is such a distinction. Accordingly, the Court construes "event occurring in the sales process" as "a real-life action or inaction that occurs in the sales process."

A0060

**"A computer implemented sales system used to facilitate a sales process, the system comprising . . ."/ "facilitating a sales process using a computer arrangement "**

These terms are used in the claims' preambles.  SFA contends the claim preambles are not claim limitations, except to the extent "a computer implemented sales system" is the antecedent reference for "the computer" used in the body of claim 1 and "a sales process" is the antecedent basis for "the sales process" used in the body of claims 1 and 40.  Docket No. 107 at 4–5.

Defendants contend the preambles are limiting because they describe the central characteristic of the claimed inventions.  Defendants argue that the term "a computer implemented sales system used to facilitate a sales process" means "a computer providing salesperson support during a sales process."  Defendants also contend that the term "facilitate a sales process using a computer arrangement" means "using a computer providing salesperson support during a sales process."  Defendants argue that their proposals are consistent with SFA's position in the previous litigation and the intrinsic evidence.  The parties have two central disputes regarding these terms.  First, the parties disagree regarding whether the preambles are limiting at all.  Second, if the preambles are limiting, the parties disagree regarding whether or how to fashion a construction.

Generally, a preamble limits the invention if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." *Eaton Corp. v. Rockwell Int'l Corp.,* 323 F.3d 1332, 1339 (Fed. Cir. 2003); *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc*., 289 F.3d 801, 808 (Fed. Cir. 2002).   When the patentee defines the invention using both the preamble and the claim body, the preamble is a claim element and therefore a limitation.  *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995).

A0061

Additionally, when limitations in the claim body rely on and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention. *See, e.g., Electro Sci. Indus. v. Dynamic Details, Inc.*, 307 F.3d 1343, 1348 (Fed. Cir. 2002). However, if the body of the claim sets out the complete invention, then the language of the preamble may be superfluous. *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1310 (Fed. Cir. 2002).

Here, the preambles in question each provide antecedent basis for the "sales process" as well as the computer (claim 1). Furthermore, the preambles are necessary to give life, meaning, and vitality to the claims. *See Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010) (citing *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)). In particular, the preambles materially define the relationship between the "sales *process*" and the computer *system*. The differences in the claims highlight the importance of the preambles. In the body of claim 1, the claimed "changes in state" are characteristic of an event occurring within the *system*, where "the system" is a reference back to the preamble's "computer implemented sales system." By contrast, in claim 20, the changes in state are "characteristic of an event occurring in the sales *process*," where the "sales process" is a reference back to the sales process of the preamble. Thus, the preambles provide important juxtaposition for the "sales process" and the computer "system." This provides essential context for understanding how various claims differ. Thus, the preambles breathe life into the claims. Accordingly, the preambles are limiting in their entirety and not merely the individual words that serve as antecedent basis.

Although the preambles are limiting, they do not require construction. Defendants seek to limit the claims to require a salesperson. Defendants' proposed constructions are not

A0062

warranted based on the claims or specification. While the specification does describe using the claimed systems and methods to assist a salesperson, it does not do so to the exclusion of other potential embodiments. Furthermore, a salesperson is not literally required by the claims, and there is no reason to import such a limitation.

Defendants also argue SFA's papers in a prior litigation support Defendants' position. Response at 12. However, Defendants have not put forth a legal theory (e.g., estoppel) that would confine this Court or bind SFA with respect to the cited prior statements. Nevertheless, the Court has examined the statements, and they do not justify a construction departing from the literal claim words. Defendants' citations refer to two discrete portions of a summary judgment response filed by SFA to defend validity of the '525 patent. The first two citations are excerpts from SFA's argument to support patentability over the "Filepp" reference:

> The Filepp '632 Patent ("Filepp") does not anticipate Claims 1, 20, or 40 of the patent-in-suit. Because these Claims have common limitations, we address them together. Although Defendant failed to dispute one element of Claim 40, for the sake of completeness, this limitation is addressed below.
>
> Filepp does not disclose the limitation a "sales system used to facilitate a sales process." The Prodigy online subscription service as described in Filepp is a proprietary predecessor of the Web and analogous to web browser servers such that it could possibly be programmed for many purposes. Thompson Report at 56 (Exhibit 2). Filepp, however, does not describe how to program the Prodigy online subscription service for direct sales from salespersons to end–user customers. In Filepp, retail sales or banking transactions were implemented as partitioned applications with only the end-user customer interacting with the systems. Thus, the patent was not directed at helping salespersons. *Id*. at 57. Despite Defendant's attempt to convince the Court otherwise by quoting only a part of one of Dr. Thompson's deposition statements, Dr. Thompson has consistently stated in his report and deposition that Filepp does not disclose the sales system of the patent-in-suit.

Ex. F to Response, *Infor Litigation*, Pl.'s Resp. Mot. Summ. J. Inv. at 4.

Defendants particularly emphasize SFA's argument that "Filepp, however, does not describe how to program the Prodigy online subscription service for direct sales from

13

salespersons to end–user customers. In Filepp, retail sales or banking transactions were implemented as partitioned applications with only the end-user customer interacting with the systems. Thus, the patent was not directed at helping salespersons." *Id*. While there is some topical connection between this passage and the current construction issue, the connection is not compelling. SFA primarily distinguished Filepp because "the Prodigy online subscription service as described in Filepp is a proprietary predecessor of the Web and analogous to web browser servers such that it could possibly be programmed for many purposes." The further arguments involving salespersons may be merely exemplary when read in the context of the prior litigation situation. Those earlier arguments by SFA did not concern whether the claims were *confined* to salesperson interaction. In other words, SFA did not argue that the claims *only* cover salesperson interaction. SFA argued in the context of validity stating that Filepp does not disclose salesperson interaction—an embodiment that is undisputedly covered by the claims. The question now before the Court is whether the claims are confined by a doctrine that justifies departure from the ordinary meaning of the claim words. The cited excerpts from the prior litigation do not provide that justification, particularly given the absence of any application of those excerpts to an appropriate legal doctrine.

Defendants also cite SFA's statement that "Further, there is a presumption in the '525 Patent that the system is aiding a salesperson who is part of a sales force." *Id*. at 15. However, the statement in the excerpt is qualified with a footnote stating: "while the sales person is using the time with customer component 104." *Id*. Thus, SFA was emphasizing that the argued "presumption" only applied to the patent's "time with customer" component. Therefore, as with the other cited excerpts, this excerpt does not relate to the boundary of the claims' meaning so it has little bearing on the current dispute. Moreover, SFA's qualification in the footnote more

A0064

broadly contradicts any notion that it was arguing to confine the claims with respect to salespersons. Furthermore, the excerpt is expressly qualified as applying to claims 5, 6 and 7, not claims 1, 20 and 40. Thus, this does not justify Defendants' proposed construction.

Having resolved the parties' disputes and the claim language being sufficiently clear itself, the preambles (while limiting) do not require construction.

**"context"**

In the previous case, the Court adopted the parties' agreed construction: "information already existing within the system that becomes relevant upon the occurrence of an event." SFA argues the Court should adopt the same construction in this case. Defendants contend the term should be construed as "customer-related information already existing within the system that becomes relevant upon the occurrence of an event." Thus, Defendants contend "context" is limited to "customer-based" information.

Defendants contend that "context" has no ordinary meaning in the art and the specification teaches that the system relies and acts on customer-related information. Defendants argue the only example of "context" in the specification is as customer-specific information. *See* '525 patent at 32:59–62. Further, Defendants contend the applicants distinguished the prior art by citing customer-related information:

> The invention recited in Claim 1 would infer the context of sending the letter to the client before scheduling the call. Perhaps the letter was to terminate the relationship with the customer. *The invention in Claim 1 might infer that because this was a termination letter (one type of context),* a follow up call was not necessary, and it would not schedule one. Without inferring the context, the follow up call would be needlessly scheduled, leading to inefficiency. The Negrino system might check to see if a letter has been sent. There are multiple results in that case. If a letter was sent, then a follow up is scheduled (a first result). If no letter was sent, then a follow up is not scheduled (a second result). Other cases might provide more possibilities for results, yet no contextual inferencing would be occurring.

A0065

Ex. M to Docket No. 260, Oct. 27, 1999 Amendment at 3–4 (emphasis added).

The suggested limitation is not required based upon the cited portion of the file history. Defendants also cite to the specification, which is similarly non persuasive. *See* '525 patent at 32:57–33:4. Finally, the claims themselves indicate a rather broad reading of the term "context." In particular, claims 1 and 40 discuss "context" of an event in the system (e.g. a computer), while claim 20 discusses "context" of an event in the sales process (e.g. a real world event). Accordingly, Defendants' proposed limitation is not appropriate in light of the claims or specification, and the Court does not adopt it.

The Court adopts its previous construction and construes "context" as "information already existing within the system that becomes relevant upon the occurrence of an event."

**"infer[ring] . . . a context"**

The Court previously construed this term as "logical process by which the fact that information already existing within the system that becomes relevant upon the occurrence of an event is derived by application of logical rules." SFA argues the Court should adopt its previous construction in this case. Defendants argue the term should instead be construed as "logical process by which the significance of [customer-related] information already existing within the system is evaluated with respect to the event [by application of logical rules to detect the changes in state]." At the hearing, Defendants alternatively proposed a modified version of its proposed construction that did not include the bracketed language.

Defendants contend this phrase warrants reconsideration because the meaning of the terms as a whole was never briefed or previously considered by the Court. Response at 22. In the previous case, the parties focused on whether the term "infer" was indefinite. Defendants contend the intrinsic and extrinsic evidence supports their construction. Specifically, Defendants

16

contend that during prosecution, the applicants made arguments that are inconsistent with SFA's current proposal and the Court's prior Order. *Id*. at 23. Defendants argue that inferring the context is not a function involving linear processing but based on an intelligent or educated understanding of information surrounding the detected changes in state. *Id*. at 22. Defendants contend they are not merely replacing the world "relevant" with "significant," but instead contend the jury should be instructed that the event manager must evaluate the significance of information already existing within the system with respect to the event, in order to determine what is relevant. Defendants also argue that SFA's current proposed construction would have been insufficient to overcome prior art references cited by the examiner. Finally, Defendants contend the intrinsic evidence does not support SFA's assertion that the step of evaluating the context must come after the context has been inferred.

SFA contends the Court's previous construction is consistent with the parties' agreed construction of "inferring" and the Court's previous construction of "context." SFA argues the Court should again reject Defendants' "customer-related" limitation. SFA further argues that Defendants' use of "evaluating" is inconsistent with the parties' agreed construction of "inferring." SFA also argues the word "relevant" is more accurate than the word "significance." SFA contends that there is no intrinsic support to require that the event manager evaluate the significance of information already existing in the system in order to infer a context in which the event at issue occurred. SFA contends Defendants are attempting to import a limitation from a preferred embodiment.

The Court adopts its previous construction and construes "inferring . . . a context" as "logical process by which the fact that information already existing within the system that becomes relevant upon the occurrence of an event is derived by application of logical rules."

17

For the reasons already discussed, the Court does not adopt Defendants' "customer-related" proposal. Defendants' proposed language of "detected changes in state" is already included in the claim language so the Court will not address that further. Additionally, including the word "significance" would merely import a word from the specification without lending any clarity. *See* '525 patent at 5:8–12. The Court has reviewed Defendants' submissions closely, and adding the word "significant" will not clarify the construction or otherwise aid the jury. Finally, the prosecution history does not support Defendants' proposal. Every claim requires detecting changes in state that are characteristic of an event and inferring the event and a context, based in part on those changes. To be clear, this requires inferring both the event and context. As Defendants suggest, during prosecution, the applicant distinguished Negrino because Negrino did not infer a context but merely teaches automatic branching. *See* Ex. I to Docket No. 260-9, July 14, 1998 Amendment at 7. Defendants argue that

> the examiner rejected the pending claims as unpatentable over Negrino in part because Negrino disclosed (1) "automated branching . . . based on detecting the outcome characteristics of a prior step" and (2) "automatic logging of [customer-related] information upon occurrence of events."Ex. N, '525 patent, Apr. 7, 1999 Office Action at 6. In response, the applicants argued that "Negrino's steps do not include inferring the context," and "[b]asing a new action upon the context of a previous event . . . is different than automated branching." Ex. M, '525 patent, Oct. 27, 1999 Amendment at 3.

Response at 23–24.

The prosecution history is clear that the argued distinction was that Negrino did not infer a context. There is no further implication from those arguments. Every claim requires inferring a context, and the Court has already defined that term. Accordingly, Defendants' proposed construction is not warranted, and the Court adopts its previous construction.

**"based on the inferred context"**

18

A0068

SFA offers no proposed construction because it contends that this term was not identified as disputed in the parties' Joint Claim Construction Statement. Defendants contend that the term should be construed as "using customer-related information already existing within the system to inform the system as to whether to proceed and what the next step should be," consistent with Defendants' proposal for "inferring . . . a context." As the Court rejected Defendants' proposal for "inferring . . . a context," it rejects Defendants' proposal for this term as well. "Based on the inferred context" relates back to the "inferring . . . a context" term and does not require construction apart from that term.

## Means-plus-function terms

Defendants contend 35 U.S.C. § 112(6) applies to "plurality of subsystems" and "event manager." Although the terms do not use the word "means," Defendants contend the terms fail to recite sufficiently definite structure and overcome the presumption that § 112(6) does not apply.

Claim limitations that use the word "means" invoke a rebuttable presumption that § 112(6) applies. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002). Conversely, claim limitations that do not use the word "means" raise a rebuttable presumption that § 112(6) does not apply. *Id.* However, limitations that do not use "means" may overcome the presumption that § 112(6) does not apply if the claim fails to recite sufficiently definite structure or recites function without sufficient structure to perform that function. *MIT v. Abacus Software*, 462 F.3d 1334, 1353 (Fed. Cir. 2006). This presumption against means-plus-function treatment for limitations not using the word "means" is a strong presumption that is seldom overcome. *Id.* at 1356. Nonce words, such as mechanism, device, means, or element, typically do not connote sufficient structure to avoid § 112(6). *Id.* at 1354.

19

**"plurality of subsystems"**

SFA contends "subsystem" should be construed as "a system that is part of a larger system" as the Court previously construed it. SFA contends the remainder of the phrase does not require construction. Defendants contend this term is governed by 35 U.S.C. § 112(6). Defendants contend "subsystem" alone fails to connote sufficient structure to one of skill in the art.

In the context of the '525 patent, a subsystem is part of a computer. This is clear from both the specification and the claims. Claims 1 and 40 state "a computer implemented sales system . . . the system comprising: a plurality of subsystems . . . ." Claim 20 calls for "a method of facilitating a sales process using a computer arrangement having a plurality of subsystems . . . ." There is no doubt that the claims require computer(s) with subsystems. The Abstract describes the system as computerized and including various subsystems. The Summary of the Invention describes the invention as a "computer sales system" that "includes a plurality of subsystems." '525 patent at 2:24–26. Here, the "plurality of subsystems" in the claim language is a clear reference to the preambles' "computer implemented sales system" (claims 1 and 40) and "computer arrangement" (claim 20). Unlike the cases Defendants cite and contrary to their arguments, the term "subsystem" is a clear reference to an earlier-stated computer system and connotes sufficient structure to one of skill in the art to avoid § 112(6) treatment. As a result, the Court's prior construction is accurate. However, the Court amends its prior construction to resolve the dispute between the parties. Therefore, the Court construes "plurality of subsystems" as "system that is part of a larger computer implemented sales system."

**"event manager"**

20

A0070

SFA argues this term is not governed by § 112(6) and should be construed as "hardware and/or software" as it was in the prior litigation. Defendants contend the term is governed by § 112(6). SFA argues that, at the time of the '525 patent, "event manager" had a reasonably well-understood meaning in the art. Defendants contend the term was not a term of art or a term that would connote sufficiently definite structure to those skilled in the art at the time of the '525 patent. Defendants argue that the references SFA cited in its opening brief do not show that an "event manager" was known in the art and SFA's arguments during the previous litigation contradict its arguments here. SFA responds to Defendants' arguments and cites additional sources supporting its position. Defendants move to strike those additional sources (Docket No. 274).

First, contrary to Defendants' arguments, SFA's arguments about "event manager" made here and made during the previous case are not inconsistent. The arguments during the previous case were made in response to a different issue and are not probative here. Second, the Court denies as moot Defendants' motion to strike. As the Court does not rely on the references as issue, the motion is pragmatically moot.

The term "event manager" is clearly not a nonce word that might typically fail to connote sufficient structure and overcome the presumption against § 112(6) treatment. Moreover, the presumption against § 112(6) treatment is strong and only rarely overcome. *MIT*, 462 F.3d at 1356. As the term is not a nonce word, the issue before the Court is whether the term is purely functional or whether it connotes structure. Figures 10A (201A), 10B (201B), 12 (201A), and 13 (201B) show the event manager as a computer module with an API (application programming interface). In addition, the specification treats the event manager as structural: "the system also includes an event manager coupled to . . . ." '525 Patent at 2:29; *see, e.g., id.* at 2:47, 8:22–43.

21

Thus, the patent clearly treats the event manager as a specific "thing" that would be understood by a skilled artisan. The patent does not discuss the event manager as a coined concept, a function, or a functional result. Furthermore, like the "subsystems" discussed above, the event manager is an expressly claimed part of the claimed computer implemented sales systems. Further, claims 1 and 40 require the event manager to have specific abilities, and in view of the expressly claimed tie to a computer, a skilled artisan would understand the claims alone to indicate that the event manager is structural. Moreover, the additional claim limitations modifying the event manager prevent event manager from reading on "anything under the sun" as Defendants argue. SFA presented sufficient evidence in its opening brief that an event manager would have connoted some structure to one of skill in the art at the time of the '525 patent. Defendants have not overcome the strong presumption against § 112(6) treatment.

As a result, the Court's prior construction is accurate. However, the Court amends its prior construction to resolve the dispute between the parties. Therefore, the Court construes "event manager" as "hardware and or software that is within a computer implemented sales system."

## CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above. For ease of reference, the Court's claim interpretations are set forth in a table as Appendix A.

**So ORDERED and SIGNED this 8th day of August, 2011.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

22

A0072

**APPENDIX A**

| Claim Term | Construction |
|---|---|
| A computer implemented sales system used to facilitate a sales process, the system comprising . . ./ facilitating a sales process using a computer arrangement | no construction |
| sales process | a process of selling goods or services, including two or more phases such as lead generation, time with customer, order management, and customer retention |
| event occurring within the system/ event occurring in the system | an operation of the software or hardware making up the sales system |
| event occurring in the sales process | a real-life action or inaction that occurs in the sales process |
| context | information already existing within the system that becomes relevant upon the occurrence of an event |
| infer[ring] . . . a context | logical process by which the fact that information already existing within the system that becomes relevant upon the occurrence of an event is derived by application of logical rules |
| based on the inferred context | no construction |
| plurality of subsystems | system that is part of a larger computer implemented sales system |
| event manager | hardware and or software that is within a computer implemented sales system |

23

A0073

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on October 28, 2014, copies of the foregoing Brief of

Defendant-Appellant was served on counsel for Plaintiff-Appellee SFA Systems

via the Court's ECF system and via electronic mail upon the following:

Marc Aaron Fenster
Adam S. Hoffman
RUSS AUGUST & KABAT
12424 Wilshire Boulevard
Suite 1200
Los Angeles, CA 90025
mafenster@raklaw.com
ahoffman@raklaw.com


/s/ Kent E. Baldauf, Jr.
Kent E. Baldauf, Jr.
*Counsel for Appellant Newegg Inc.*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that the body of this brief, beginning with the Jurisdictional Statement on page 1, and ending with the last line of the conclusion on page 61,  including headings, footnotes, and quotations, is presented in Times New Roman 14-point font and contains 13,986 words, in compliance with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

/s/ Kent E. Baldauf, Jr.
Kent E. Baldauf, Jr.
*Counsel for Appellant Newegg Inc.*